**UNION CAMP CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Dastech International, Inc., ICC Industries, Inc., Guangdong Chemicals Import & Export Corp., Sinochem International Chemicals Co., Ltd., and Tianjin Chemicals Import & Export Corp., Defendants–Intervenors.**

**Slip Op. 98–38.**
**Court No. 97–04–00483.**

United States Court of
International Trade.

March 27, 1998.

See also, 963 F.Supp. 1212.

Fenwick & West,(Roger M. Golden and Phyllis E. Andes), Washington, DC, for Plaintiff.

Frank H. Hunger, Asst. Atty. General; David M. Cohen, Director; U.S. Department of Justice, Civil Division, Commercial Litigation Branch,(Lucius B. Lau); Keun Ho Bae, of counsel, Office of the Chief Counsel for Import Administration, for Defendant.

Williams, Mullen, Christian & Dobbins, P.C., (William E. Perry, Thomas B. McVey, and W. David Snead), Washington, DC, for Defendants–Intervenors.

## MEMORANDUM AND ORDER

WALLACH, Judge.

### I

### INTRODUCTION

This consolidated action is before the Court on two motions for judgment upon the agency record pursuant to USCIT R. 56.2. Plaintiff Union Camp Corporation ("Union Camp") and Defendant–Intervenors Dastech International, Incorporated, ICC Industries, Incorporated, Guangdong Chemicals Import & Export Corporation, Sinochem International Chemicals Company, Limited, and Tianjin Chemicals Import & Export Corporation (collectively "Dastech") challenge as unsupported by substantial evidence and not in accordance with law certain aspects of the Department of Commerce, International Trade Administration's ("Commerce") decision in *Sebacic Acid from the People's Republic of China; Final Results of Antidumping Duty Administrative Review,* 62 Fed.Reg. 10,530 (Mar. 7, 1997) ("*Final Results*"). The Court has jurisdiction under 28 U.S.C. § 1581(c) (1994).

Union Camp contests five aspects of Commerce's decision. Commerce agrees to, and Defendant–Intervenors do not oppose, remand on three of Union Camp's challenges, and the fourth is moot in view of the Court's decision.[1] The remaining issue is Commerce's decision to use the Indian value of octanol–1 as the surrogate value of crude octanol–2, a subsidiary product of the sebacic acid production process.

Defendant–Intervenors contest Commerce's treatment of two sales of sebacic acid that were made through Sinochem International Chemicals Company, Ltd. ("SICC") on behalf of Sinochem Jiangsu Import and Export Corporation ("Jiangsu"). Commerce used Jiangsu's 243.4 percent margin to (1) assess antidumping duties for these sales and (2) establish SICC's future cash deposit rate.

For the reasons discussed below, the Court holds that Commerce's use of the Indian value of octanol–1 for octanol–2 was unsupported by substantial evidence on the record and not in accordance with law. The Court affirms Commerce's decision regarding the sales on behalf of Jiangsu.

### II

### BACKGROUND

On July 19, 1993 Union Camp filed a petition with Commerce and the United States International Trade Commission ("ITC") alleging that sebacic acid[2] from the People's

---

**1.** The Court is remanding to Commerce to: (1) consider whether the surrogate values obtains from The Economic Times were inclusive or exclusive of taxes; (2) calculate the average castor oil prices using the figure 23.32/kg; (3) allocate a by-product credit for glycerine to the cost of production for sebacic acid and octanol-1 to a tax-exclusive basis, is moot because the Court is remanding to Commerce on the issue of the valuation of octanol-2.

**2.** Sebacic acid is a chemical which has numerous industrial applications, for example, produc-

Republic of China ("PRC") was being sold at prices below fair market value to the detriment of the domestic industry. *Initiation of Antidumping Duty Investigation; Sebacic Acid from the People's Republic of China,* 58 Fed.Reg. 43,339 (Aug. 16, 1993). After the appropriate investigations by Commerce and the ITC, it was determined that Union Camp's allegations had merit, and Commerce issued the *Antidumping Duty Order: Sebacic Acid From the People's Republic of China (PRC),* 59 Fed.Reg. 35,909 (July 14, 1994).

Union Camp and Dastech challenged the initial less than fair value determination.[3] On August 5, 1996, this Court remanded to Commerce on the issue of the valuation of octanol–2 and upheld Commerce's actions in all other respects. *Union Camp Corp. v. United States,* 941 F.Supp. 108 (CIT 1996) (*"Union Camp I"*). This Court instructed Commerce "to value octanol–2 based on an appropriate cost (which may be the U.S. cost) of crude octanol–2 rather than the Indian selling price for refined octanol–1...." *Id.* at 119. Commerce complied with the Court's directions and used Union Camp's internal cost of octanol–2 found in the petition. The Court affirmed the remand results on April 11, 1997. *Union Camp Corp. v. United States,* 963 F.Supp. 1212 (CIT 1997).

Meanwhile, on August 16, 1995, Commerce initiated an antidumping duty administrative review of sebacic acid from the PRC at issue in this case. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part,* 60 Fed.Reg. 42,500. The administrative review covered shipments of sebacic acid from the PRC to the United States during the period of July 13, 1994 through June 30, 1995. *Final Results,* 62 Fed.Reg. at 10,530. As in the initial investigation, Commerce used India as the surrogate country and was unable to locate an Indian value for octanol–

2. Therefore, Commerce used the Indian value of octanol–1 for valuing octanol–2.

At verification, Commerce discovered that two sales which were reported as SICC sales were sales made by SICC on behalf of Jiangsu. Jiangsu did not participate in the administrative review. Consequently, Commerce determined that Jiangsu would be subject to the country-wide rate of 243.4 percent. Commerce assessed this rate to those sales. Because "SICC knowingly engaged in sales to the United States of [Jiangsu's] material, according to statements by SICC at verification, as an attempt to assist Jiangsu in avoiding posting of Jiangsu's higher antidumping duty cash deposits", *Final Results,* 62 Fed. Reg. at 10,532, Commerce included those two sales at the 243.4 percent rate in calculating the dumping margin to be applied to SICC.

## III

## DISCUSSION

### A

### Standard Of Review

The Court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law...." 19 U.S.C. § 1516a(b)(1)(B) (1994). " 'Substantial evidence is something more than a "mere scintilla," and must be enough reasonably to support a conclusion.' " *Primary Steel, Inc. v. United States,* 17 CIT 1080, 834 F.Supp. 1374, 1380 (1993) (citation omitted). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States,*

---

tion of nylon 6/10 (a polymer used for paintbrush and toothbrush bristles and paper machine felts), plasticizers, esters, automotive coolants, inks and adhesives, and lubricants. *See Notice of Final Determination of Sales at Less Than Fair Value: Sebacic Acid from the People's Republic of China,* 59 Fed.Reg. 28,053 (May 31, 1994) (*"Final Determination"*).

3. In a separate action, Dastech challenged the ITC's affirmative finding of a threat of injury to a domestic industry. *See Sebacic Acid From the People's Republic of China,* Inv. No. 731–TA–653 (Final), USITC Pub. No. 2793 (1994). This Court sustained the ITC's action in *Dastech Int'l, Inc. v. United States Int'l Trade Comm'n,* 963 F.Supp. 1220 (CIT 1997).

10 CIT 399, 404–5, 636 F.Supp. 961, 966 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987).

In reviewing an agency's construction of the statute that the agency administers, the Court's initial inquiry is to determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 843–44, 104 S.Ct. 2778. Consequently, "[t]he court will defer to the agency's construction of the statute as a permissible construction if it 'reflects a plausible construction of the plain language of the statute[s] and does not otherwise conflict with Congress' express intent.' " *Torrington Co. v. United States,* 82 F.3d 1039, 1044 (Fed.Cir.1996) (citation omitted).

## B

### Commerce's Determination To Value Octanol–2 Using The Indian Value Of Octanol–1 Was Unsupported By Substantial Evidence On The Record And Not In Accordance With Law

■ The PRC is a nonmarket economy ("NME") country. For NME investigations, the statute provides:

> [Commerce] shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce].

19 U.S.C. § 1677b(c)(1) (1994). Thus, "Commerce's task in a nonmarket economy investigation is to calculate what a producer's costs or prices would be if such prices or costs were determined by market forces."

*Tianjin Mach. Import & Export Corp. v. United States,* 16 CIT 931, 940, 806 F.Supp. 1008, 1018 (1992).

"[T]o the extent possible", the surrogate is a country "at a level of economic development comparable" to the NME and which has "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4) (1994). Commerce's regulations provide for the following order of preference in selecting comparable economies: (1) a market economy country at a stage of economic development comparable to that of the home market country, other than the United States; (2) a market economy country not at a stage of economic development comparable to that of the home market country, other than the United States; and (3) the United States. *See* 19 C.F.R. § 353.52(b) (1997).

Here, Commerce chose India as the surrogate country. Commerce calculated normal value by multiplying the verified factors of production by the appropriate surrogate values for the different inputs. *See Sebacic Acid From the People's Republic of China; Preliminary Results of Antidumping Duty Administrative Review,* 61 Fed.Reg. 46,440, 46,442 (Sept. 3, 1996) ("*Preliminary Results* "). The production of sebacic acid results in the production of subsidiary chemical products. Commerce considers these products to be by-products or co-products. For purposes of calculating normal value, by-product sales revenues are subtracted from sebacic acid production costs while co-product costs (material, labor, energy and factory overhead) are allocated among sebacic acid and the subsidiary products. *See id.* at 46,-443.

Commerce valued octanol–2, a subsidiary product of the sebacic acid production process, using the Indian value of octanol–1. This resulted in the determination that octanol–2 was a co-product of sebacic acid, not a by-product as claimed by Union Camp. According to Union Camp, this determination resulted in the erroneous allocation of octanol–2 costs rather than the subtraction of them from sebacic acid production costs.

## 1

### The Court Is Not Bound By *Res Judicata,* Collateral Estoppel Or *Stare Decisis* In Deciding This Issue

Union Camp claims that because this Court decided whether the Indian value of refined octanol–1 may be used to value octanol–2 in *Union Camp I,* Commerce may not argue a different course of action here. Union Camp bases its argument on the principals of *res judicata,* collateral estoppel and *stare decisis.* For the reasons that follow, the Court rejects Union Camp's argument.

### a

### Res Judicata and Collateral Estoppel

The Restatement (Second) of Judgments provides the Court with guidance on issues of *res judicata* and collateral estoppel (or issue preclusion). *See, e.g., American Permac, Inc. v. United States,* 16 CIT 672, 674–75, 800 F.Supp. 952, 954–55 (1992), *aff'd,* 996 F.2d 1236, 1993 WL 150624 (Fed.Cir.1993); *PPG Indus., Inc. v. United States,* 14 CIT 522, 537, 746 F.Supp. 119, 133 (1990). It states:

> The principal concepts developed in this Chapter are: merger—the extinguishment of a claim in a judgment for plaintiff (§ 18); bar—the extinguishment of a claim in a judgment for defendant (§ 19) and issue preclusion—the effect of the determination of an issue in another action between the parties on the same claim (direct estoppel) or a different claim (collateral estoppel) (§ 27). The term "res judicata" is here used in a broad sense as including all three of these concepts. When it is stated that "the rules of res judicata are applicable," it is meant that the rules as to the effect of a judgment as a merger or a bar or as a collateral or direct estoppel are applicable.

*PPG Indus., Inc. v. United States,* 13 CIT 297, 300–301, 712 F.Supp. 195, 198 (1989) (quoting *Young Engineers, Inc. v. United States Int'l Trade Comm'n,* 2 Fed. Cir. (T) 9, 19, 721 F.2d 1305, 1314 (1983), quoting Restatement (Second) of Judgments (1982)), *aff'd,* 978 F.2d 1232 (Fed.Cir.1992).

In order to effect issue preclusion the following criteria must be met: "(i) the issue previously adjudicated is identical with that now presented, (ii)[ ] the issue was 'actually litigated' in the prior case, (iii) the previous determination of that issue was necessary to the end decision then made, and (iv) the party precluded was fully represented by counsel in the prior action." *PPG Indus.,* 13 CIT at 301, 712 F.Supp. at 199 (quoting *Thomas v. GSA,* 794 F.2d 661, 664 (Fed.Cir. 1986)).

This Court has stated:

> The burden on the party seeking issue preclusion is and should be exacting. This is especially so in trade cases, since Congress has made specific provision for periodic administrative reviews in countervailing duty and dumping cases. (See 19 U.S.C. § 1675(a) (1982 & Supp. V 1987).) Since the agencies involved perform the function of expert finders of fact concerning different programs, different time frames, economic statistics and other factors in countervailing duty and dumping investigations as well as similar functions during periodic reviews, principles of issue preclusion should be carefully applied. To hold otherwise would have a chilling effect upon the administrative processes envisioned by the Congress.

*PPG Indus.,* 13 CIT at 302, 712 F.Supp. at 199. The Court agrees with Union Camp that the valuation determination was actually litigated; the valuation determination was necessary to the end-decision made in *Union Camp I;* and that Commerce was fully represented by counsel in *Union Camp I.* The issue, however, is not identical.

Commerce must base its decision upon an administrative record. The record for review by this Court is "a copy of all information presented to or obtained by" Commerce "during the course of the administrative proceeding" as well as a copy of the determination, all transcripts, and all notices published in the Federal Register. *See* 19 U.S.C. § 1516a(b)(2)(A) (1994). Here, the record on review for this issue contained different information than the initial investigation. Specifically, Commerce included an in-depth explanation of why its interpretation of the term "comparable merchandise" was a reasonable interpretation of the stat-

ute. *Compare Final Determination*, 59 Fed.Reg. at 28,058 *with Final Results* 62 Fed.Reg. at 10,535. Although Commerce included an almost identical explanation in its *Final Results of Redetermination Pursuant to Court Remand, [Union Camp I]*, Exhibit ("Exh.") 3 to Union Camp's Reply, in the Redetermination, it provided additional analysis in response to the Court's reasoning and instructions in *Union Camp I*. That additional analysis, taken in conjunction with the fact that the administrative record covers a different time period, takes this case outside the "exacting" burden for issue preclusion.[4] Thus, although the issues in *Union Camp I* and this case were very close, the differences in the records for review preclude the application of collateral estoppel.

### b

### *Stare Decisis*

■■■■ Union Camp claims that the doctrine of stare decisis compels the Court to reach an identical decision on the issue of the valuation of octanol-2 as it did in *Union Camp I*. The doctrine provides that " 'a decision on an issue of law embodied in a final judgment is binding on the court that decided it and such other courts as owe obedience to its decision, in all future cases.' " *Cabot Corp. v. United States*, 12 CIT 664, 670 n. 5, 694 F.Supp. 949, 953 n. 5 (1988) (quoting 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 0.401 (2d ed.1988)). Consequently, " 'like facts will receive like treatment in a court of law.' " *Id.* (quoting *Flowers v. United States*, 764 F.2d 759, 761 (11th Cir.1985)). As discussed above, *Union Camp I* and the case before the Court now are not the same. As a result, the Court finds the doctrine inapplicable and will address the merits of Commerce's position.

### 2

### Commerce's Interpretation Of The Phrase "Comparable Merchandise" In This Case Is Not Reasonable

Congress has provided some guidance regarding the meaning of the term "compara-

ble". In the conference report accompanying H.R. 3, "to be treated as the legislative history to accompany [the Omnibus Trade and Competitiveness Act of 1988]", 1988 U.S.C.C.A.N. 1547, in reference to the factors of production of "comparable" merchandise, the report states that "Commerce should seek to use, if possible, data based on production of the **same general class or kind of merchandise** using similar levels of technology and at similar levels of volume as the producers subject to investigation." H.R.Rep. No. 110-576, at 591 (1988), *reprinted in* U.S.C.C.A.N. 1547, 1624 (emphasis added). Thus, Congress's guidance regarding the term "comparable merchandise" is that it be the same general class or kind of merchandise. The question before the Court, then, is whether Commerce's decision that octanol-1 is comparable to octanol-2 based on their similar molecular formulae is a reasonable interpretation ·of the statute. *See Chevron*, 467 U.S. at 842–44, 104 S.Ct. 2778.

■■■■ In practice, Commerce has considered the price or use of a surrogate in determining whether it is a comparable product. *See, e.g., Nation Ford Chem. Co. v. U.S.*, 985 F.Supp. 133, 137 (CIT 1997), *appeal docketed* (Fed.Cir. Feb. 9, 1998) (Court upheld Commerce's use of an Indian price for imported aniline instead of the Indian price for domestic aniline even though the PRC used aniline produced domestically stating: "Commerce rejected the use of Indian domestic prices because it found that they were distorted by forces peculiar to India.... [I]t was reasonable to conclude that those [domestic] prices were not adequately representative of the situation in the PRC."); *Shieldalloy Metallurgical Corp. v. United States*, 947 F.Supp. 525, 532 (CIT 1996) (Court found Commerce's method for adjusting raw material prices to account for differences in grade and quality to be within Commerce's discretion.); *Kerr–McGee Chem. Corp. v. United States*,

---

4. The administrative record from the initial investigation of sebacic acid from the PRC covered the period of January 1, 1993 to June 30, 1993. *Final Determination*, 59 Fed.Reg. at 28,053. The

*Final Results* cover the first administrative review of sebacic acid for the period of July 13, 1994 to June 30, 1995. *Final Results*, 62 Fed. Reg. at 10,530.

985 F.Supp. 1166, 1176 (CIT 1997) (Court affirmed Commerce's use of a value for manganese ore over four other possible surrogate values, stating that "Commerce considered the pros and cons of both [the ore it used and the ore Plaintiff wanted it to use] and decided 'the manganese content of [the ore it used] is more comparable to the ore used by the Chinese producers than the ore with the higher manganese content . . . [and] it represents a domestic Indian price.' "); *Writing Instrument Mfrs. Assoc., Pencil Section v. United States,* 984 F.Supp. 629, 636 (CIT 1997), *appeal docketed,* Nos. 981178, 981292 (Fed.Cir. Jan. 9, 1998, Jan. 21, 1998) (*"Writing Instrument "*) (Court upheld Commerce's use of U.S. basswood prices as a surrogate price for Chinese lindenwood which is indigenous to the PRC because Commerce's decision was "based on the opinion of industry experts that basswood is 'nearly indistinguishable' from Chinese lindenwood while [another proposed surrogate] is only 'quite similar.' "). Thus, the Court has found Commerce's consideration of value or use in determining the appropriate surrogates to be a reasonable interpretation of the term "comparable".

Here, in using the Indian price of octanol–1 to value octanol–2, Commerce simply stated:

> the Department used an Indian price for octanol–1 as a surrogate value for octanol–2 as the best available information after the Department concluded that, for purposes of factor valuation, octanol–1 was comparable to octanol–2. We find that octanol–1 and capryl alcohol (octanol–2) share very similar molecular formulae though they are not identical products. Since product-specific information is not available from our recommended surrogate countries, we must rely on the price of the closest product we could obtain to value capryl alcohol.

*Final Results,* 62 Fed.Reg. at 10,534–35.

Commerce's only explanation as to how octanol–1 was comparable to octanol–2 is the similar molecular formulae. Commerce does not examine whether the products are comparable in value or use. Indeed, Commerce states:

The Department does not delve into intricacies of the production and use of every potential surrogate precisely because production and use are not necessarily relevant to valuation of factors of production. . . . Similarly, the Department is not required to consider interchangeableness in determining whether to use a particular surrogate to value a factor of production.

*Final Results,* 62 Fed.Reg. at 10,535. Commerce, however, is ignoring its prior legal standard. It must either provide an explanation for how octanol–1 is comparable to octanol–2 based on some acceptable standard or it must offer a reasonable explanation of why it is changing its legal standard for such determinations. In this case, Commerce's interpretation of the term "comparable" to mean similar in molecular formulae, without more, is not a reasonable interpretation of the statute.

### 3

### The Use Of The Indian Value Of Octanol–1 Is Unsupported By Substantial Evidence

██ Notwithstanding the Court's finding that Commerce's interpretation of the phrase "comparable merchandise" is unreasonable, Commerce's decision is also unsupported by substantial evidence on the record. Commerce stated:

> the Department will consider rejecting a potential surrogate where it has evidence that a possible surrogate value does not reasonably reflect the "value" of the factor. For example, if the Department had evidence that a surrogate price was significantly higher than other potential surrogate prices for a particular factor, the Department might find that it was not reasonable to use that particular price as a surrogate value.

*Final Results,* 62 Fed.Reg. at 10,535. Yet here, as discussed below, Commerce failed to consider all the values for octanol–2 that were placed on the record.

Commerce found that there is no sebacic acid production in India, the surrogate country for valuing factors of production. *See Final Results,* 62 Fed.Reg. at 10,533. Be-

cause octanol–2 is only produced during the sebacic acid process, the parties have been unable to find an appropriate Indian value for octanol–2. *See id.* at 10,534. Consequently, the parties placed several surrogate values on the record for octanol–2. Dastech submitted the Indian value of octanol–1 found in the *Indian Chemical Weekly* which was ultimately chosen by Commerce. *See id.* at 10,535. Dastech also provided a U.S. value for octanol–2 found in the *Chemical Marketing Reporter. See Final Results,* 62 Fed. Reg. at 10,533. Union Camp provided its internal cost for octanol–2. *See id.* at 10,534. Union Camp also submitted calculations to adjust the U.S. value for octanol–2, which Union Camp claims to be the cost for refined octanol–2, to value crude octanol–2. *See id.*

Commerce discussed its reason for selecting the Indian value for octanol–2, *i.e.,* the similar molecular formulae. It also discussed why it rejected Union Camp's internal cost of octanol–2 based on Commerce's preference for public, published information. *Final Results,* 62 Fed.Reg. at 10,535. Commerce failed to discuss, or apparently consider, however, the U.S. value of octanol–2 placed on the record by Dastech or Union Camp's submission regarding an adjustment of that U.S. value to reflect that Dastech's submission reflected the value of refined octanol–2.[5] In addition, Commerce's acknowledgment that "it is not clear from the Indian Chemical Weekly whether [respondents'] listed price for 'octanol' refers to octanol–1, octanol–2, or a combination of the two products", *id.* at 10,534, eliminates that source as evidence in support of Commerce's determination.

Commerce admits that "the Department may use values from the United States or other countries not at a comparable level of development for individual factors... [when] it cannot find those values in a comparable economy that produce comparable merchandise." *Final Results,* 62 Fed.Reg. at 10,533. This is in accordance with Commerce's regulations. *See* 19 C.F.R. § 353.52(b) (1997). Recently, the Court upheld Commerce's decision to use a U.S. value in a case where

surrogate values from other market economy countries were submitted. *Writing Instrument,* 984 F.Supp. at 636. In *Writing Instrument,* Commerce needed a surrogate value for Chinese lindenwood. Commerce rejected an Indian value and instead used a U.S. value because the U.S. wood was "nearly indistinguishable" from the lindenwood even though the Indian wood was "quite similar". *Id.* The Court rejected plaintiffs argument that "the use of any surrogate prices from the U.S. frustrates the statute since the U.S. market economy is not at a level of economic development comparable to that of the PRC's economy.... " *Id.* The Court found that "Commerce's use of U.S. [surrogate] is consistent with the primary objective of the statute [to determine the most accurate dumping margins]...." *Id.* at 637. Thus, Commerce's failure here to consider the other surrogate values placed on the record results in its valuation of octanol–2 using the Indian value of octanol–1 being unsupported by substantial evidence on the record.

## C

### Commerce's Treatment Of Jiangsu's Sales Was Reasonable And Supported By Substantial Evidence On The Record

Dastech claims that Commerce erred when it assessed the country-wide rate to the sales SICC made on behalf of Jiangsu and when it included these sales in its calculation of SICC's dumping margin. According to Dastech, by applying the country-wide rate to these sales, Commerce meant to punish SICC and Dastech which violates the remedial purpose of the statute. Dastech also argues that Commerce's action contravenes Article 5 of the U.S. Constitution because there was no full due process hearing before an impartial administrative law judge. For the reasons that follow, the Court rejects Dastech's argument and upholds the dumping rate Commerce assigned to those sales and

---

**5.** Commerce's statement that "there is no evidence on the record that octanol–2 is sold in [the United States]", *Final Results,* 62 Fed.Reg. at 10,535, directly contradicts its acknowledgment of a U.S. price of octanol–2 from the *Chemical Marketing Reporter* submitted by Dastech. *Id.* at 10,533, 10,534.

the inclusion of the Jiangsu sales in SICC's margin.

## 1

### There Is Substantial Evidence On The Record That The Sales Were Jiangsu Sales, Not SICC Sales

■ Dastech claims that the "transaction between Jiangsu and SICC was an internal transaction between two companies located in the NME country and, therefore, in light of past Department practice, should be disregarded." Dastech Reply at 4. For support, Dastech cites to *Fresh Garlic From the People's Republic of China; Final Results of Antidumping Duty Administrative Review and Partial Termination of Administrative Review*, 62 Fed.Reg. 23,758 (1997). In *Fresh Garlic*, Commerce stated:

> we have interpreted the relevant prices in such a sales situation to be the price at which the first party in the chain of distribution who had knowledge of the U.S. destination sells the merchandise. However, we explained that this practice is restricted with regard to NME cases, since we will not base export price on internal transactions between two companies located in the NME country.

62 Fed.Reg. at 23,759.

Contrary to Dastech's assertions, there is substantial evidence on the record that the two sales in question were Jiangsu sales and not SICC sales. Even though SICC reported these sales as their own in the questionnaire responses, SICC considered these sales to be Jiangsu sales. *See* Aug, 27, 1996 Mem. to Spetrini, Exh. 3 to Dastech's Brief In Support of Its Motion For Jdmt ("Dastech's Mot."), at 1–2; *see also* Feb. 24, 1997 Mem. to LaRussa, Exh. 4 to Dastech's Mot., at 1–2. At verification, SICC officials presented to Commerce a contract between Jiangsu and SICC. *See* Aug. 26, 1996 Verif. of Sales Questionnaire Response of SICC Mem., Exh. 1 to Defendant's Oppos., at 6 ("Verif. of SICC"). The contract, as translated, says that [each

party will perform certain services for the other party]. Ex. 2 to Defendant's Oppos., at 3.[6] An SICC official explained to Commerce that "Jiangsu asked SICC to act as its agent because Jiangsu had received a higher antidumping duty rate in the investigation than had SICC." Verif. of SICC, Exh. 1 to Defendant's Oppos., at 7.

In the *Preliminary Results*, Commerce stated: "[f]or SICC, at verification we found that certain sales reported as SICC were in fact sales by another respondent company, Jiangsu." 61 Fed.Reg. at 46433. Because the contract shows that the Jiangsu asked SICC to sell a specific amount of sebacic acid at a specific price, Commerce's conclusion that the SICC sold the merchandise in the United States "at prices and terms set by Jiangsu ...", *Final Results*, 62 Fed.Reg. at 10,532, and that, therefore, these sales were actually Jiangsu sales is supported by substantial evidence on the record.

## 2

### Commerce Properly Applied The Country–Wide Rate To The Jiangsu's Sales

In NME administrative reviews, Commerce determines whether an exporter is entitled to a separate rate based on an absence of government control. If not, Commerce assigns the country-wide rate to that company. *Preliminary Results*, 61 Fed. Reg. at 46,442. The countrywide rate is based on best information available ("BIA"). Commerce is allowed to use an adverse inference in calculating BIA. *See* 19 U.S.C. § 1677e(b) (1994).

■ Here, although Jiangsu participated in the initial investigation, it did not respond to the questionnaire issued by Commerce in this administrative review. As a result, the Court upholds Commerce's decision that Jiangsu was not entitled to a separate rate and its assessment of the country-wide rate to Jiangsu. Further, because there is substantial evidence on the record that the sales

---

6. Although Commerce was not given a contract for one of the two sales at issue, SICC officials told Commerce "that observation 10 was also made on behalf of Jiangsu" so that Jiangsu could avoid paying the higher antidumping duty. Verif. of SICC, Exh. 1 to Defendant's Oppos., at 7.

made by SICC on behalf of Jiangsu were in fact Jiangsu sales, as discussed above, the Court finds that Commerce appropriately valued them using the country-wide rate.

### 3

### Commerce's Assessment Of The Jiangsu Rate To The Two Sales And Their Inclusion In SICC's The Margin Is Not A Penalty

Administrative reviews establish the assessment rate for entries during the period of review and the deposit rate for future entries. 19 U.S.C. § 1675(a)(1) (1994). Commerce assesses antidumping duties on an importer-specific basis. *Antidumping Duties; Countervailing Duties,* 62 Fed.Reg. 27,296, 27,302 (May 17, 1997).

In *C.J. Tower & Sons v. United States,* 21 C.C.P.A. 417, 71 F.2d 438 (1934), it was stated:

> we cannot escape the conviction that the expressed purpose of Congress, in the Anti–Dumping Act of 1921, was to impose not a penalty, but an amount of duty sufficient to equalize competitive conditions between the exporter and American industries affected.... It follows that the Anti–Dumping Act of 1921 is not repugnant to the provisions of said Amendment 5 [to the U.S. Constitution], as denying to the importer due process of law....

*Id.* at 427; 71 F.2d at 445–46. "Dumping duties are not penal in nature, but are 'additional duties' to equalize competitive conditions between the exporter and [affected U.S. industries]." *Imbert Imports, Inc. v. United States,* 67 Cust. Ct. 569, 576 n. 10, 331 F.Supp. 1400, 1406 n. 10 (1971), *aff'd,* 60 C.C.P.A. 123, 475 F.2d 1189 (1973). The purpose of the statute, then, is solely remedial. *Chaparral Steel Co. v. United States,* 901 F.2d 1097, 1103–04 (Fed.Cir.1990).

Dastech argues that Commerce's calculation of SICC's margin is a penalty. According to Dastech, Commerce's actions are contrary to the antidumping statute because the statute does not give Commerce the authority to impose a penalty. Dastech points to the amount of money it will have to pay as a result of Commerce's calculation in support of its argument that this is a penalty.

In the *Final Results,* Commerce stated:

> [o]ur use of the rate of 243 percent was not punitive. Because these are Jiangsu sales, we applied the rate that Jiangsu would have received on the sales to the United States. That the rate is 243 percent is reflective only of Jiangsu's failure to respond to the Department's questionnaire and the Department's application of the country-wide rate to Jiangsu is consistent with its normal practice.... SICC knowingly engaged in sales to the United States of another respondent's material, according to statements by SICC at verification, as an attempt to assist Jiangsu in avoiding posting of Jiangsu's higher antidumping duty cash deposits. Therefore, it is appropriate and consistent with the remedial nature of the statute, to apply the Jiangsu rate to these transactions in calculating SICC's rate. SICC's margin should reflect any dumping on sales in which it is the exporter of record.

62 Fed.Reg. at 10,532.

 The Court will not consider Commerce's calculation of a dumping margin to be a penalty simply because the margin is large. So long as Commerce's methodology is reasonable and its actions are supported by substantial evidence on the record, the Court will uphold Commerce's determination. *Ceramica Regiomontana, S.A.,* 10 CIT at 404–5, 636 F.Supp. at 966.[7] Here, Commerce reasonably applied the country-wide rate to the Jiangsu sales because of the evidence on the record that the sales were Jiangsu sales and Jiangsu did not respond to the questionnaire. The inclusion of the

---

7. The U.S. importer, Dastech International, Inc., claims that "there is substantial evidence on the record of this investigation that Dastech [International, Inc.] bought the sebacic acid from SICC with the understanding that SICC was the exporter of record and could sell the sebacic acid at the 43% dumping margin." Dastech Reply at

1–2. However, the expectations of the U.S. importer are irrelevant in setting a dumping margin. When a U.S. importer deals with a foreign company that is subject to an antidumping duty order, the importer must realize that the dumping margin could change to its benefit or detriment.

Jiangsu sales in the dumping margin Commerce calculated for SICC was also reasonable because SICC was the exporter of record. That the result was a significant sum of money does not convert Commerce's action into a penalty.

Finally, the Court rejects Dastech's claim that the amount of the antidumping duties assessed by Commerce implicate the Due Process Clause of the United States' Constitution because they could force the U.S. importer into bankruptcy. The U.S. importer claims that it has liberty and property interests in its right to stay in business. However, the U.S. importer has no rights other than to receive due process as provided for in the antidumping statute. The record reflects that the U.S. importer actively participated in the administrative review and was allowed to submit information to Commerce as well as present its arguments through case briefs and hearings. In addition, because Commerce's actions were supported by substantial evidence on the record and in accordance with law, the Court finds that the U.S. importer received all the procedural protections due to it.

## IV

## CONCLUSION

For the foregoing reasons, this matter is remanded to Commerce with instructions that Commerce value octanol–2 based on an appropriate cost of crude octanol–2, which may be the U.S. cost but which may not be based solely on similar molecular structure without any additional evidence, and then recalculate the by-product/co-product determination with the correct value. Defendant–Intervenors' Motion For Judgment Upon Its Agency Record is denied.

## ORDER

This case having come before the Court for decision, and the Court, having reviewed the papers and pleadings on file herein, having heard oral argument by each party, and after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED ADJUDGED AND DECREED that this case is remanded to the Department of Commerce with instructions to value octanol–2 based on an appropriate cost (which may be the U.S. cost but which may not be based solely on similar molecular structure without any additional evidence) of crude octanol–2, and then recalculate the by-product/co-product determination with the correct value; and it is further

ORDERED ADJUDGED AND DE-CREED that, on remand, the Department of Commerce will consider whether the surrogate values obtained from *The Economic Times* were inclusive or exclusive of taxes; and it is further

ORDERED ADJUDGED AND DE-CREED that, on remand, the Department of Commerce calculate the average castor oil prices using the figure 23.32/kg; and it is further

ORDERED ADJUDGED AND DE-CREED that, on remand, the Department of Commerce allocate the glycerine by-product credit to sebacic acid and octanol–2; and it is further

ORDERED ADJUDGED AND DE-CREED that remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due; and it is further

ORDERED ADJUDGED AND DE-CREED that Defendant–Intervenors' Motion For Judgment Upon the Agency Record is denied; and it is further

ORDERED ADJUDGED and DECREED that all parties shall review the Memorandum and Order and notify the Court on or before April 20, 1998 whether any information contained in the Memorandum and Order is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter. If a party determines that no information needs to be deleted, that party shall so notify the Court on or before April 20, 1998.