SLIP OP. 99-40

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| UNION CAMP CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | **BEFORE: Wallach, Judge** |
| v. | : | **Consol. Court No. 97-03-00483** |
| | : | |
| THE UNITED STATES, | : | **PUBLIC VERSION** |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| DASTECH INTERNATIONAL, INC., et al., | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

[Remanded in part.]

Decided: April 29, 1999

Fenwick & West, LLP (Roger M. Golden and Phyllis E. Andes) for Plaintiff.

David Ogden, Acting Assistant Attorney General; David M. Cohen, Director; U.S. Department of Justice, Civil Division, Commercial Litigation Branch, (Lucius B. Lau); Keun Ho Bae, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

Williams, Mullen, Christian & Dobbins, P.C., (William E. Perry and W. David Snead) for Defendant-Intervenors.

**OPINION**

**I**

**INTRODUCTION**

At issue in this case is the proper surrogate value for octanol-2, a subsidiary product of the sebacic acid production process, that is to be used by the International Trade Administration of the U.S. Department of Commerce ("ITA" or "Commerce") in its first administrative review of antidumping duties on sebacic acid from the People's Republic of China ("PRC"). See Sebacic Acid from the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 62 Fed. Reg. 10,530 (1997) ("First Administrative Review"). This case is before the Court for the second time, following the Court's Memorandum and Order of March 27, 1998, ("Remand Memorandum" and "Remand Order"), directing Commerce, inter alia, to "value octanol-2 based on an appropriate cost (which may be the U.S. cost but which may not be based solely on similar molecular structure without any additional evidence) of crude octanol-2, and then recalculate the by-product/co-product determination with the correct value." Union Camp Corp. v. United States, 8 F. Supp.2d 842, 853 (CIT 1998). Commerce issued its remand determination on June 25, 1998. See Remand Determination: Union Camp Corporation v. United States (Consol. Court No. 97-03-00483) ("Remand Determination"). The parties subsequently submitted their respective comments on the Remand Determination, and Defendant-Intervenors' submitted a motion asking the Court to reconsider its Remand Order ("Motion To Reconsider").

For the reasons stated herein, the Court agrees with Defendant-Intervenors and finds that its Remand Order was ambiguous, in so far as Commerce interpreted the Remand Order as preventing it from considering record evidence of market prices in valuing the octanol-2 that results from the sebacic acid production process. Accordingly, the Court grants Defendant-Intervenors' Motion To Reconsider and remands this case for further consideration consistent with this opinion. In doing so, however, the Court takes judicial notice of the fact that in its third administrative review of antidumping duties on sebacic acid from the PRC, Commerce, on the basis of a letter from the editor of the Chemical Weekly (India), reversed its previous position and found that the "octanol" quote from this publication did not refer to octanol-1. See Sebacic Acid From The People's Republic of China; Final Results of Antidumping Duty Administrative Review, 63 Fed. Reg. 43,373, 43,374-75 (1998) ("Third Administrative Review"). Having taken judicial notice of this fact, the Court directs Commerce to consider the letter from the editor of the Chemical Weekly (India) in choosing an appropriate surrogate value on remand.

Finally, the Court further instructs Commerce that it is to consider whether it should accept new evidence concerning the comparability of 2-ethylhexanol and octanol-2. Should Commerce come to the conclusion that it should accept such evidence, Commerce may do so and, if appropriate, use that evidence as a basis for justifying its use of the Chemical Weekly

(India) value for "octanol" as a surrogate value.

## II

## BACKGROUND

The relevant facts of this case are described in Union Camp Corp. v. United States, 8 F. Supp.2d 842 (CIT 1998), and familiarity with them is presumed. Only the facts relevant to the disposition of Defendant-Intervenors' Motion To Reconsider are repeated.

On March 7, 1997, Commerce issued its First Administrative Review, covering shipments of sebacic acid from the PRC to the United States during the period July 13, 1994, through June 30, 1995. First Administrative Review, 62 Fed. Reg. at 10,530. Because the PRC is a nonmarket economy, Commerce determined the "normal value" of the sebacic acid using a constructed value pursuant to 19 U.S.C. § 1677b(c)(1) (1994), which provides that, where appropriate, Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise." In valuing the factors of production, Commerce is to use, where possible, "prices or costs . . . in one or more market economy countries" that are at a comparable level of economic development and that are "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4) (1994)

For the First Administrative Review, Commerce used surrogate values from India to construct the normal value of the sebacic acid. See First Administrative Review, 62 Fed. Reg. at 10,533. In doing so, Commerce used a published price for "octanol" from the Chemical Weekly (India) to value the octanol-2 that is produced, as a subsidiary product, through the sebacic acid production process. See id. at 10,534-35. Although the "octanol" quote from the Chemical Weekly (India) does not make clear whether it refers to octanol-2 or another type of octanol, Commerce assumed that this price was for octanol-1 and concluded that octanol-1 was a comparable product to octanol-2. See id. at 10,534. Commerce's only explanation as to how the two products were comparable, however, was that they have similar molecular formulae. See id.

Before this Court, Plaintiff challenged Commerce's conclusion concerning the comparability of octanol-1 and octanol-2, arguing that the decision was not supported by substantial evidence on the record and not otherwise in accordance with law. See Brief In Support Of Union Camp Corporation's Rule 56.2 Motion For Judgment Upon The Agency Record, dated September 5, 1997, at 19-21. On March 27, 1998, the Court agreed with Plaintiff and found that Commerce's interpretation of the word "comparable" in 19 U.S.C. § 1677b(c)(4) (1994), to mean similar molecular structure, was not a reasonable interpretation of the statute. Union Camp, 8 F. Supp.2d at 849. The Court stated that Commerce "must either provide an

explanation for how octanol-1 is comparable to octanol-2 based on some acceptable standard [value or use] or it must offer a reasonable explanation of why it is changing its legal standard for such determinations." Id.  In regard to Commerce's conclusion also being unsupported by substantial evidence, the Court stated:

> Commerce discussed its reason for selecting the Indian value of octanol-2, i.e., the similar molecular formulae.  It also discussed why it rejected Union Camp's internal cost of octanol-2 based on Commerce's preference for public, published information.  Commerce failed to discuss, or apparently consider, however, the U.S. value of octanol-2 placed on the record by Dastech or Union Camp's submission regarding an adjustment of that U.S. value to reflect that Dastech 's submission reflected the value of refined octanol-2. . . .  Thus, Commerce's failure here to consider the other surrogate values placed on the record results in its valuation of octanol-2 using the Indian value of octanol-1 being unsupported by substantial evidence on the record.

Id. at 850 (citation omitted).

In light of these findings, the Court remanded this case to Commerce with the following instructions:

> [I]t is hereby . . .  ORDERED ADJUDGED AND DECREED that this case is remanded to [Commerce] with instructions to value octanol-2 based on an appropriate cost (which may be the U.S. cost but which may not be based solely on similar molecular structure without any additional evidence) of crude octanol-2, and then recalculate the by-product/co-product determination with the correct value . . . .

Id. at 853.

On June 25, 1998, Commerce issued its Remand Determination, in which it used Union Camp's internal cost for crude octanol-2 as a surrogate for the octanol-2 produced by Defendant-Intervenors.  Remand Determination at 3, 9-10.  Even though Commerce identified and discussed additional record evidence that supported its use of the Chemical Weekly (India) value of refined octanol -- and commented that this value "is the best available information to effectuate the Department's goal of determining the most accurate margin possible," Remand Determination at 6 -- it nevertheless stated that it felt constrained by the Court's Remand Order from using or considering other possible surrogate values that were on the record.  Commerce stated that:

The Department is using the U.S. cost of crude octanol-2 to recalculate the dumping margins because the court instructed us to value octanol-2 based on an appropriate "cost" of crude octanol-2 and the only value on the record for "cost" of crude octanol-2 is the petitioner's U.S. cost of crude octanol-2. The Department's use of such a value necessitates a recalculation of the dumping margins. However, the Department has also identified for the court additional record evidence that octanol-1 and octanol-2 are comparable in use. It remains the Department's position, as reflected in the determination on remand, that using the petitioner's U.S. cost of crude octanol-2 is inappropriate because it results in less accurate dumping margins.

Remand Determination at 10. See also Defendant's Response To The Comments Filed By Union Camp And Dastech Regarding The Remand Determination Filed by The Department of Commerce ("Defendant's Response") at 3 ("Commerce did not utilize the data contained in *Chemical Weekly* (India) because this Court's remand order specifically instructed the agency to 'value octanol-2 based on an appropriate cost . . . .'"). In so finding, Commerce again did not consider the U.S. prices from the Chemical Marketing Reporter (U.S.) for octanol-2 that were placed on the record by Defendant-Intervenors. Presumably, Commerce concluded that, as the value reported in the Chemical Marketing Reporter (U.S.) reflects a market price for refined octanol-2, it was precluded from considering this figure by the Court's Remand Order. See Remand Determination at 3, 8-10.[1] In addition, although Commerce reasserted its position that the Chemical Weekly (India) value for "octanol" is the "best available information," it also did not identify any record evidence on remand to confirm exactly what product (octanol-1, octanol-2 or some other product) was being referenced by this figure. See Remand Determination at 6 ("[G]iven that the Chemical Weekly (India) does not specify a particular type of octanol, we believe that evidence on the record suggests that the refined octanol price listed in the Chemical Weekly (India) is a reasonable surrogate value for octanol-2.")

Using Union Camp's internal cost of crude octanol-2 (10.372 Indian rupees per kg / $0.15 per lb) as the surrogate, Commerce concluded that octanol-2 is a by-product of the sebacic acid

---

[1] The only direct discussion of the Chemical Marketing Reporter (U.S.) values occurs on pages 8 and 9 of the Remand Determination, where Commerce discussed Defendant-Intervenors' contention that the 36 percent price difference between the octanol-1 and octanol-2 values in the Chemical Marketing Reporter (U.S.) would reflect a similar price difference in the Indian market. In response to this observation, Commerce simply reiterated that although it believed the Chemical Weekly (India) value to be the most appropriate surrogate, it was nevertheless using Union Camp's cost information to value octanol-2 "in accordance with the Court's instructions." Remand Determination at 9.

production process, "because the overall value of octanol-2 is insignificant relative to the value of sebacic acid and the other subsidiary products." Remand Determination at 4. In so finding, Commerce reversed its previous conclusion that, based on the Chemical Weekly (India) value for octanol-1 of 76 Indian rupees per kg, octanol-2 should be treated as a co-product for cost accounting purposes. See First Administrative Review, 62 Fed. Reg. at 10,533-35; Sebacic Acid from the People's Republic of China; Preliminary Results of Antidumping Duty Administrative Review ("Preliminary Results"), 61 Fed. Reg. 46,440, 46,443 (1996).[2]

Because Commerce claimed that the language of the Court's Remand Order inappropriately constrained its consideration of appropriate surrogate values, on July 27, 1998, Defendant-Intervenors submitted a motion asking this Court to reconsider its Remand Order. According to Defendant-Intervenors, because either the Remand Order or Commerce's reading of the Remand Order was "manifestly erroneous," "[Commerce] has issued an unfair and inaccurate determination which is directly contrary to the statute, the legislative history, prior court cases and generally accepted accounting principles." Defendant-Intervenors' Comments On The Commerce Department's Remand Determination And Memorandum In Support Of Motion For Reconsideration ("Reconsideration Memorandum") at 1, 33. In response, Plaintiff asserts that Defendant-Intervenors' argument that a refined octanol value can be an appropriate surrogate is untimely, that Union Camp has not manipulated its price of crude octanol-2, that Union Camp's cost of crude octanol-2 is fair, that use of certain statements concerning the comparability of octanol-1 and octanol-2 are unreliable, and that deference to Commerce supports sustaining the Remand Determination. Plaintiff Union Camp Corporation's Rebuttal Comments And Response In Opposition To Defendant-Intervenors' Motion For Reconsideration ("Plaintiff's Response") at 3-6. Plaintiff also argues that Defendant-Intervenors' Motion For Reconsideration is untimely

---

[2] To determine the correct accounting treatment of a subsidiary product, Commerce examines, in accordance with generally accepted accounting principles (GAAP), whether the value of a subsidiary product is significant or insignificant relative to the other products that result from a particular production process. See Remand Determination at 3-4; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Sebacic Acid From the People's Republic of China, 59 Fed. Reg. 565, 569 (1994) ("By-products are identified by their relatively insignificant sales value, whereas [co-products] . . . generally have significant sales value relative to the product under investigation."); Elemental Sulphur From Canada; Final Results of Antidumping Finding Administrative Review, 61 Fed. Reg. 8,239, 8,241-42 (1996) (identifying several factors Commerce examines to determine the relative significance of a particular subsidiary product). For calculating normal value, Commerce subtracts the sales revenues of by-products from the production costs of the main product. See Preliminary Results, 61 Fed. Reg. at 46,443. In contrast, if Commerce determines that a subsidiary product is a co-product, it will allocate production costs between the main product and the co-product. See id.

under USCIT R.59 and that Defendant-Intervenors have failed to state any substantive grounds under USCIT Rs.59 and 60 that would justify granting the Motion For Reconsideration.  Id. at 7-13.

For its part, Defendant says that, "[a]s is apparent from the Remand Determination, Commerce carefully examined this Court's remand order, concluded that the Court's use of the word 'cost' was deliberate, and, as a result, valued octanol-2 based upon the 'cost' of crude octanol-2."  Defendant's Response at 2.  Since Commerce complied with the Court's Remand Order, Defendant argues, "the Court should sustain the remand results, enter final judgment, and dismiss the action."  Id.  Defendant also notes, however, that Commerce "would be willing to undergo another remand so that it may utilize the Chemical Weekly (India) price."  Id. at 4.

Independent from, and subsequent to, Commerce's First Administrative Review and the Remand Determination, on August 13, 1998, Commerce published the final results of its Third Administrative Review, covering the period July 1, 1996, through June 30, 1997.  Third Administrative Review, 63 Fed. Reg. at 43,373.  In that review, the respondents submitted a letter written by the editor of the Chemical Weekly (India) stating that the "octanol" value in the Chemical Weekly (India) refers to 2-ethylhexanol.  Id. at 43,374.  Though apparently a type of octanol, 2-ethylhexanol appears to be a distinct product from octanol-1 and octanol-2.  Id. at 43,374-75.  Based on this letter and other record evidence concerning similar uses, Commerce concluded that 2-ethylhexanol and 2-octanol are comparable merchandise and, accordingly, found that the Chemical Weekly (India) price for "octanol" is the most appropriate surrogate for valuing octanol-2.  Id. at 43,375.

## III

## DISCUSSION

## A

## Standard Of Review

The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).  Substantial evidence is something more than a "mere scintilla," and must be enough evidence to reasonably support a conclusion.  Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993) (quoting Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd., 810

F.2d 1137 (Fed. Cir. 1987)).  "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology."  Ceramica Regiomontana, S.A., 10 CIT at 404-5, 636 F. Supp. at 966.

In reviewing an agency's construction of the statute that the agency administers, the Court's initial inquiry is to determine "whether Congress has directly spoken to the precise question at issue."  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984).  "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."  Id. at 843-44.  Consequently, "[t]he court will defer to the agency's construction of the statute as a permissible construction if it 'reflects a plausible construction of the plain language of the statute[s] and does not otherwise conflict with Congress' express intent.'"  Torrington Co. v. United States, 82 F.3d 1039, 1044 (Fed. Cir. 1996) (citing Rust v. Sullivan, 500 U.S. 173, 184 (1991)).

**B**

**The Court Grants Defendant-Intervenors' Motion For Reconsideration.**

**1**

**The Court Considers Defendant-Intervenors' Motion
For Reconsideration Under USCIT R. 59.**

Although, on its face, USCIT R. 59 provides only for "[a] new trial or rehearing . . . in an action tried without a jury or in an action finally determined," it has been well-recognized that the concept of a new trial under this Rule is broad enough to cover a rehearing of any matter decided by the Court.  Nat'l Corn Growers Ass'n v. Baker, 9 CIT 571, 584, 623 F. Supp. 1262, 1274 (1985), rev'd on other grounds 840 F.2d 1547 (Fed. Cir. 1988) (quoting Timken Co. v. United States, 6 CIT 76, 76, 569 F. Supp. 65, 67 (1983), (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2804 at 35 (1973))).  Accordingly, the Court will consider Defendant-Intervenors' Motion For Reconsideration in light of USCIT R. 59.

As this Court has previously noted, the grant of a motion for reconsideration is within the sound discretion of the Court.  Union Camp v. United States, 963 F. Supp. 1212, 1213 (1997) (citing Kerr-McGee Chem. Corp. v. United States, 14 CIT 582, 583 (1990)).  "The purpose of a

rehearing is not to relitigate a case," but to rectify a significant flaw in the conduct of the original proceedings.  Kerr-McGee, 14 CIT at 583 (citations omitted).  Although specific grounds upon which a court may grant such a motion are not listed in the Rule, it is well established that a motion for reconsideration should be granted, and the underlying judgment or order modified, when a movant demonstrated that the judgment is based on manifest errors of law or fact.  See 11 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2810.1 at 125 (2nd ed. 1995) ("[T]he movant may demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based.")

While a motion for reconsideration is to be considered under the standards of USCIT R.59, it is clear that, in this instance, the time limit set out in USCIT R. 59(b) does not prevent this Court from properly considering Defendant-Intervenors' Motion For Reconsideration.  Under USCIT R. 59(b), "[a] motion for a new trial or rehearing shall be served and filed not later than 30 days after the entry of judgment or order."  Citing this Rule, Plaintiff argues that this Court lacks jurisdiction to hear Defendant-Intervenors' Motion For Reconsideration, since it was filed on July 27, 1998 -- 121 days after the Remand Order was entered and 91 days after the 30 day time limit expired.  Plaintiff's Response at 6-7.

Contrary to Plaintiff's claim, however, the 30 day time limit of USCIT R. 59(b) does not render this Court without jurisdiction to hear the Motion For Reconsideration.  As this Court and others have held, the time limit set out in USCIT R. 59(b) and the corresponding rule of federal civil procedure, Fed. R. Civ. P. 59(b),[3] only apply to final judgments or orders.  See Timken, 6 CIT at 78, 569 F. Supp. at 68; Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 712 n.10 (2d Cir. 1983); Warner v. Rossignol, 513 F.2d 678, 684 n.3 (1st Cir. 1975); Manos v. Trans World Airlines, Inc., 324 F. Supp. 470, 488 (N.D. Ill. 1971); Graci v. United States, 301 F. Supp. 947, 950 (E.D. La. 1969), aff'd 456 F.2d 20 (5th Cir. 1971).  Cf. Garrett v. Blanton, 1993 WL 17697, at * 3 (E.D. La. 1993) (holding that "an interlocutory judgment on liability issues is not a 'judgment' for purposes of [Fed. R. Civ. P] 59"); O. Hommel Co. v. Ferro Corp., 659 F.2d 340, 353-54 (3d Cir. 1981) (finding that a judgment for purposes of Fed. R. Civ. P 50(b) is not final until attorney's fees have been determined).  In contrast, a motion for reconsideration of an interlocutory order "is proper at any time prior to the final determination of the merits." Timken, 6 CIT at 78, 569 F. Supp. at 68 (quoting Graci, 301 F. Supp. at 950).  As explained by Wright, Miller and Kane:

---

[3] USCIT R. 59(b) provides for a 30-day period within which to move for a new trial or rehearing.  In contrast, Fed. R. Civ. P. 59(b) provides only for a 10-day period.  The lengthier period is required by 28 U.S.C. § 2646 (1994), a statute only applicable to the Court of International Trade.

> The reason for a short time limit on motions for a new trial is to promote finality of judgments. That policy is not applicable to an interlocutory order, which by hypothesis is not final and is subject to modification by the court at any time before judgment is entered. Thus, it has been held that the time limits of Rule 59 do not apply to a motion seeking a new trial in connection with an interlocutory judgment.

Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2812 at 143 (2d ed. 1995)

There is no debate as to the interlocutory nature of the Court's Remand Order. As the Federal Circuit has made clear, as a general rule "an order remanding a matter to an administrative agency for further findings and proceedings is not final." Cabot Corp. v. United States, 788 F.2d 1539, 1542 (Fed. Cir. 1986) (remand to Commerce is not an appealable final judgment); accord Badger-Powhatan, A Division Of Figgie Int'l, Inc. v. United States, 808 F.2d 823, 825 (Fed. Cir. 1986); Jeannette Sheet Glass Corp. v. United States, 803 F.2d 1576 (Fed. Cir. 1986). While it is true that "remands are not all of the same nature" and that a remand can be considered a final judgment in certain circumstances, Travelstead v. Derwinski, 978 F.2d 1244, 1249 (Fed. Cir. 1992), nothing in the nature or terms of the Court's Remand Order made this a final judgment. According to the terms of the Remand Order, after Commerce complied with the Court's instructions, the parties were allowed to submit to the Court both initial and rebuttal comments on Commerce's Remand Determination. See Union Camp, 8 F. Supp.2d at 853. Further, upon reviewing these comments, this Court retained the discretion to either remand this case for yet further consideration by Commerce or affirm the Remand Determination. Given these facts, the Court's Remand Order is interlocutory and, as such, is subject to modification by the Court notwithstanding the 30 day time limit of USCIT R. 59(b).[4]

---

[4] In footnote 2 of its Response, Plaintiff notes that, "[w]hether the Order is a 'final judgment' or not is irrelevant to application of USCIT R.59. The rule is not restricted to final judgments or orders but applies to any judgments or orders." Plaintiff's Response at 7 n.2 (citation omitted). As the discussion above makes clear, this assertion is simply incorrect. Because the authority cited by Plaintiff (Belfont Sales Corp. v. United States, 12 CIT 916, 698 F. Supp. 916 (1988), aff'd 878 F.2d 1413 (Fed. Cir. 1989)), Plaintiff's Response at 7, involved a final order in a classification case, the case is inapposite to the facts at bar.

**2**

### On Remand, Commerce May Use an Appropriate  "Cost," "Value" or "Price" for Octanol-2 in Making its By-Product / Co-Product Determination.

As noted earlier, in the initial Remand Order the Court instructed Commerce, "to value octanol-2 based on an appropriate <u>cost</u> . . . of crude octanol-2." <u>Union Camp</u>, 8 F. Supp.2d at 853 (emphasis added).  In its Reconsideration Memorandum, Defendant-Intervenors essentially argue that the Court's use of the word "cost" was manifestly erroneous, since it allowed Commerce to claim it had to rely on Union Camp's internal, unverified cost for crude octanol-2 (the only "cost" value on the record) and ignore other, more appropriate, surrogate values that were on the record.  <u>See</u> Reconsideration Memorandum at 31-33, 36-38.

The Court grants Defendant-Intervenors' Motion For Reconsideration.  In its Remand Memorandum of March 27, 1998, the Court stated that one reason the <u>First Administrative Review</u> was unsupported by substantial evidence was the fact that Commerce "failed to discuss, or apparently consider," the <u>Chemical Marketing Reporter</u> (U.S.) value for octanol-2 put on the record by Defendant-Intervenors.  <u>Union Camp</u>, 8 F. Supp.2d at 850.  Since the <u>Chemical Marketing Reporter</u> (U.S.) value for octanol-2 was a market <u>price</u> for refined octanol, the obvious implication of this finding was that Commerce could -- and, in fact, must -- consider both "costs" and "prices" on the record in selecting an appropriate surrogate value for octanol-2.  Similarly, the implication of the Court's holding that Commerce's use of the <u>Chemical Weekly</u> (India) price for "octanol" was unsupported by substantial evidence is that, should substantial evidence be identified on remand, Commerce could use this market <u>price</u> for octanol on remand.

Despite the obvious implication of these findings, however, the Court's actual Remand Order of March 27, 1998, stated that Commerce "was to value octanol-2 based on an appropriate <u>cost</u> . . .  of crude octanol-2." <u>Union Camp</u>, 8 F. Supp.2d at 853 (emphasis added).  Simply put, this Order was ambiguous.  As specifically provided by statute, in valuing the factors of production for constructing the "normal value" of merchandise in a non-market economy, Commerce "shall utilize, to the extent possible, the <u>prices or costs</u> of factors of production" in a comparable market economy.  19 U.S.C. § 1677b(c)(4) (1994) (emphasis added).  In this case, two market prices for octanol were placed on record by the parties and, in accordance with 19 U.S.C. § 1677b(c)(4) (1994), should have been evaluated along with Union Camp's internal "cost" of crude octanol-2 as possible surrogate values.  Commerce, however, chose to view the Court's use of the word "cost" in a restrictive manner, and concluded that the Court's use of this term limited its ability to consider market prices on remand.  In so doing, Commerce rendered

the Remand Order legally erroneous, since its interpretation led the Remand Order to directly conflict with, and limit, Commerce's statutory discretion to consider prices.

Further, and again based on Commerce's restrictive interpretation, it appears that the Court's use of the word "cost" may have prevented Commerce from using the "best available information" in determining normal value for the sebacic acid. As required by 19 U.S.C. § 1677b(c)(1) (1994), in determining normal value in a non-market economy, "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy . . . . " The purpose of such a requirement, of course, is to achieve the most accurate dumping margins possible. See Tianjin Mach. Import & Export Corp. v. United States, 16 CIT 931, 940, 806 F. Supp. 1008, 1018 (1992) ("Commerce's ability to construct foreign market value from weighted alternatives advantageously serves the antidumping statute's purpose of 'determining current margins as accurately as possible.'"). As Commerce notes in its Remand Determination, however, Union Camp's internal cost for crude octanol-2 is not the "best available information":

> The Department believes that a more accurate margin results if subsidiary products, such as octanol-2, are valued using publicly available information reflecting actual market **prices** rather than the petitioner's internal **cost**. Thus, the Department uses publicly available market prices whenever possible, because they are more predictable and reliable. Publicly available values reflect actual transactions between buyers and sellers and therefore are a more accurate reflection of the market value of a subsidiary product. Internal cost values, particularly those of a party in the current segment of a proceeding may be less reliable and subject to manipulation. Moreover, in the present case, the petitioner's internal cost information for crude octanol-2 is unverified.

Remand Determination at 4; see also id. at 6 ("[T]he Department maintains that the value for refined octanol from *The Chemical Weekly* (India) is the best available information to effectuate the Department's goal of determining the most accurate margin possible.")

Finally, Commerce's interpretation appears to place the Remand Order in conflict with Asociacion Colombiana de Exportadores de Flores v. United States, 6 F. Supp.2d 865 (CIT 1998) and Asociacion Colombiana de Exportadores de Flores v. United States, 13 CIT 13, 704 F. Supp. 1114 (1989), aff'd 901 F.2d 1089 (Fed. Cir. 1990). In both these cases, this Court accepted Commerce's methodology, which used GAAP, of (a) using market values to help determine whether a subsidiary product is a by-product or a co-product; and (b) after determining that the subsidiary products were by-products, offsetting the total cost of production with revenues

earned from the sale of these by-products.  See Asociacion Colombiana, 6 F. Supp.2d at 881-82; Asociacion Colombiana, 13 CIT at 26, 704 F. Supp. at 1125; see also IPSCO, Inc. v. United States, 12 CIT 384, 388-89, 687 F. Supp. 633, 636-37 (1988), rev'd on other grounds 956 F.2d 1056 (Fed. Cir. 1992)[5] (citing various ITA investigations that looked to relative sales value as a factor in determining whether a product is a by-product or co-product).  Because there appear to be no material facts which would distinguish, and make Commerce's methodology inappropriate for, the facts at bar, limiting Commerce's ability to consider market prices would constitute a repudiation of Commerce's GAAP-based methodology and the opinions of this Court which have approved it. That was not even hinted at in the Court's Remand Memorandum.  The methodology to be employed by Commerce in determining whether octanol-2 should be treated as a by-product or a co-product for cost accounting purposes was not an issue that was before this Court.

In short, the Court's limiting use of the word "cost" in its initial Remand Order was ambiguous and, accordingly, subject to an interpretation that would constitute an error of law preventing Commerce from considering potentially appropriate price data in determining Defendant-Intervenors' dumping margins.  Rather than seeking to clarify the apparent ambiguity, however, Commerce chose to interpret it in a fashion designed to render its decision erroneous. For this reason, the Court remands this case to Commerce with instructions that it value the octanol-2 that results from the sebacic acid production process based on an appropriate surrogate value for this product, and then recalculate the by-product/co-product determination with this correct value.  This surrogate value may be a an appropriate foreign or U.S. cost or price for comparable merchandise.  As noted in the Court's Remand Memorandum and Remand Order, however, Commerce may not determine that a particular product is "comparable merchandise" for purposes 19 U.S.C. § 1677b (1994) based solely on a finding of similar molecular structure. See Union Camp, 8 F. Supp.2d at 849, 853.

On this point, it should be stressed that no value Commerce chooses as a surrogate will be deemed supported by substantial evidence until Commerce considers the Chemical Marketing Reporter (U.S.) value for octanol-2 put on the record by Defendant-Intervenors and either (a) adopts it as a surrogate value, or (b) explains why it is rejecting it for these purposes.  As the

---

[5] Ipsco, Inc. v. United States, 965 F.2d 1056 (Fed. Cir. 1992), reversed the trial court's subsequent determination (at 13 CIT 402 (1989)) that Commerce should take sales values into account in allocating sales between co-products.  In Asociacion Colombiana, this Court made clear that this holding should not be read as limiting Commerce's discretion to use market values, or prices, in determining the proper cost accounting treatment for subsidiary products.  See Asociacion Colombiana, 6 F. Supp.2d at 881 ("IPSCO does not, however, as HOSA maintains, limit Commerce's discretion to use value to distinguish between by-products and co-products."); accord E.I. DuPont De Nemours & Co., Inc. v. United States, 932 F. Supp. 296, 302 (1996).

Court specifically noted in its Remand Memorandum, in regard to Commerce's initial failure to consider this value, "Commerce's failure here to consider the other surrogate values placed on the record results in its valuation of octanol-2 using the Indian value of octanol-1 being unsupported by substantial evidence on the record." Id. at 450; see also Olympia Industrial, Inc. v. United States, 7 F. Supp.2d 997, 1001 (CIT 1998) ("Commerce has an obligation to review all data and then determine what constitutes the best information available or, alternatively, to explain why a particular data set is not methodologically reliable."). Accordingly, the Court further orders Commerce, in seeking the best available information to use as a surrogate, to specifically consider and address all alternative surrogate values that have been placed on the record -- including the Chemical Marketing Reporter (U.S.) Value for Octanol-2.[6]

**3**

**If Appropriate, on Remand Commerce May Use an Unadjusted Value for "Refined" Octanol as a Surrogate for the Octanol-2 Produced by Defendant-Intervenors.**

An additional issue raised by the Remand Determination is whether Commerce may use a value for refined octanol, without adjustment, as a surrogate for the octanol-2 produced by Defendant-Intervenors. In its Remand Determination, Commerce stated:

> The sebacic acid factors of production used to calculate normal value ("NV") already incorporate the relatively few factors of production (labor and energy) necessary to refine crude octanol-2. Production of sebacic acid results in the production of crude octanol-2 as a subsidiary product. Given that the sebacic acid factors of production already include the factors used to refine octanol-2, a more accurate by-product/co-product analysis results by using the refined value of octanol-2. There is no need to take a refined value of octanol-2 and then adjust it to derive a value for crude octanol-2. Moreover, there is a publicly published sales price on which we can base a value for refined octanol-2.

---

[6] This does not mean that Commerce may not use Union Camp's internal cost in valuing octanol-2. As indicated in the Remand Memorandum, Commerce must consider and address the appropriateness of using this value, as well as the Chemical Marketing Reporter (U.S.) value for octanol-2, in order to have its determination supported by substantial evidence on the record. Union Camp, 8 F. Supp.2d at 849-50. Should Commerce determine that Union Camp's internal cost for crude octanol-2 is the best available information, and that use of this figure is supported by substantial evidence on the record, Commerce may use this figure as its surrogate value. Absent such a conclusion, however, nothing in this or the Court's initial Remand Memorandum and Remand Order should be read as either requiring or prohibiting the use of this value.

Remand Determination at 5.

On the basis of this logic, Defendant-Intervenors argue extensively that Commerce erred in its Remand Determination in using Union Camp's internal cost for crude octanol-2, since "[t]he actual production experience of the Chinese producers is that the Chinese produce refined octanol, not crude octanol, in their production process." Reconsideration Memorandum at 11. Defendant-Intervenors essentially argue that since refined octanol is the actual product sold by the Chinese producers, it is a surrogate value for this product, and not crude octanol-2, that Commerce should use in determining whether a subsidiary product is a by-product or a co-product. See id. at 7-18. Defendant-Intervenors observe that using such a value would be consistent with both Commerce's prior practice and recognized accounting principles, which provide that whether a product is by-product or a co-product is determined by the products' sales value relative to that of the principal product or products produced (in this case, sebacic acid). Id. at 12-18. In fact, Defendant-Intervenors even take exception to Commerce's general characterization that the "[p]roduction of sebacic acid results in the production of crude octanol-2 as a subsidiary product." See id. at 9 (quoting Remand Determination at 5).

For its part, Plaintiff argues that both Commerce and Defendant-Intervenors should be estopped from arguing for the use of a surrogate value for refined octanol, since this Court has already determined that the product produced by the Chinese producers was crude octanol-2. Plaintiff's Response at 3-4. To support its point, Plaintiff observes that neither Commerce nor Defendant-Intervenors had earlier contested its argument to use a surrogate value for crude, rather than refined, octanol-2. Id. at 3.

In light of these various comments, two separate issues confront the Court. The first is whether Commerce may use an unadjusted value for "refined" octanol in valuing the octanol-2 that results from the sebacic acid production process. Because this case is being remanded to Commerce for further consideration, it would be premature for this Court to examine whether Commerce's preference for using an unadjusted, refined value for octanol is appropriate. This is especially true in light of Section III (C) of this memorandum, which may preclude Commerce from using the Chemical Weekly (India) price as a surrogate upon remand. That said, however, it should be noted that nothing in either the initial Remand Memorandum or the Remand Order should be interpreted as either requiring or prohibiting the use of an unadjusted, refined value as a surrogate. Rather, the Court's Remand Memorandum simply indicates that, in order to be affirmed by the Court, Commerce's choice of a surrogate value must be supported by substantial evidence on the record and be based on a reasonable interpretation of the term "comparable merchandise." See Union Camp, 8 F. Supp.2d at 848-50. If, upon remand, Commerce continues to adhere to its position that an unadjusted, refined value is the best available information to use

as a surrogate, the Court will uphold this determination so long as it meets these standards.

The second issue that appears to have been raised is whether the subsidiary product produced by Defendant-Intervenors should be referred to as "refined" or "crude" octanol-2. In regard to Commerce's First Administrative Review and the parties' respective motions for judgment on the agency record, the Court notes that there was virtually no discussion of whether the octanol-2 at issue should be characterized as "crude" or "refined" in nature. While it is true that Plaintiff argued in its September 25, 1997, brief that the (presumably) large price difference between refined octanol-1 and crude octanol-2 demonstrates the inappropriateness of using octanol-1 to value octanol-2, Plaintiff simply assumed, without specifically arguing, that the subsidiary product was "crude" octanol-2. See Brief In Support Of Union Camp Corporation's Rule 56.2 Motion For Judgment Upon The Agency Record, dated September 5, 1997, at 18. Further, since the characterization of the octanol-2 did not appear to be a point of contention among the parties, the Court never specifically addressed the "crude" versus "refined" octanol-2 issue in its Remand Memorandum and Remand Order. Rather, the Court simply characterized the product produced as "crude" octanol.

In light of the foregoing, it would be incorrect to say either that this "refined" versus "crude" issue was previously litigated, or that the Court decided this issue in its initial Remand Memorandum and Remand Order. At this point in the litigation, it appears that the characterization of the subsidiary product produced by Defendant-Intervenors is a non-issue. Whether characterized as "crude" or "refined" octanol-2, the main issue that Commerce needs to decide is what record evidence constitutes the most appropriate surrogate value for this product. Even assuming, without deciding, that the product produced by Defendant-Intervenors is best described as "crude" octanol-2, there is no particular reason why Commerce could not use a refined price or cost in valuing this product, subject to any necessary adjustments. The appropriateness of such action, again, would depend on whether Commerce's choice of a surrogate value can be supported by substantial evidence on the record and based on a reasonable interpretation of the term "comparable merchandise."

C

**Use of the Chemical Weekly (India) Value for Octanol-2 Is Still Not Supported by Substantial Evidence on the Record.**

As noted previously, on remand Commerce identified new evidence on common uses between octanol-1 and octanol-2 to support its position that, notwithstanding the Court's Remand Order, the Chemical Weekly (India) value for refined octanol was "the best available information

to effectuate [Commerce's] goal of determining the most accurate margins possible." Remand Determination at 6. In doing so, however, Commerce continued to assume, without verifying, that the "octanol" value from the Chemical Weekly (India) was for octanol-1. Standing alone, such an assumption undermines Commerce's use of this figure, since "octanol" is a generic phrase which covers a full range of products. In this case, however, not only does the lack of verification call Commerce's use of this figure into question, but evidence of which this Court may take judicial notice seems to show that Commerce's assumption is, in fact, incorrect.

As discussed in Section II, in its Third Administrative Review, Commerce relied on a letter from the editor of the Chemical Weekly (India) in finding that the "octanol" price from this publication was not for octanol-1 or octanol-2, but was for a third product, 2-ethylhexanol. Third Administrative Review, 63 Fed. Reg. at 43,374-75. This conclusion, of course, plainly contradicts Commerce's repeated assertion that the "octanol" quote from the Chemical Weekly (India) is for octanol-1, and it renders Commerce's evidence of overlapping uses and composition between octanol-1 and octanol-2 superfluous. Given the apparent contradiction, and given the likelihood that Commerce will continue to assert that the octanol price from the Chemical Weekly (India) is the best available evidence, it is appropriate for this Court to take judicial notice[7] of the fact that Commerce, on the basis of the letter from the editor of the Chemical Weekly (India), reversed its position in the Third Administrative Review and found that the "octanol" quote did not refer to octanol-1. See Third Administrative Review, 63 FR 43,374-75 ("Therefore, based on the above information, and absent any substantiated record evidence to the contrary, the Department determines that the octanol value from Chemical Weekly is for 2-ethylhexanol.").

Having taken judicial notice of that fact, the Court orders Commerce, on remand, to open the administrative record and consider the letter from the editor of the Chemical Weekly (India) in its choice of an appropriate surrogate value. While the Court notes that it is not ruling on the accuracy or significance of this new evidence, see Borlem, 913 F.2d at 940 ("[A]ll we are doing is recognizing that new data exists that the [agency] should evaluate."), it also observes that, unless rebutted, the existence of this evidence appears to undermine Commerce's rationale for using the Chemical Weekly (India) "octanol" value as a surrogate. Accordingly, unless Commerce is able to identify substantial record evidence on remand which demonstrates that, notwithstanding the letter from the editor of the Chemical Weekly (India), the "octanol" quote

_____

[7] The Court takes judicial notice pursuant to Fed. R. Evid. 201(c), which provides, in relevant part, that "[a] court may take judicial notice, whether requested or not." See Borlem S.A. - Empreedimentos Industriais v. United States, 913 F.2d 933, 940 (Fed. Cir. 1990) (upholding judicial notice of "the fact that a new and different [margin] determination has been made based on the premise that the earlier one was incorrect").

from the Chemical Weekly (India) is actually a quote for octanol-1, Commerce may not continue to argue for the use of this figure on the grounds that octanol-1 and octanol-2 are "comparable merchandise."

In arriving at this result, the Court is mindful of the considerable deference that Commerce enjoys in its administration of the antidumping laws. Such deference, however, is not owed when credible evidence from outside the record indicates a significant error in Commerce's determination. See, e.g., id. (upholding remand to ITC for reconsideration of its injury determination in light of its reliance on an ITA dumping margin that was later corrected); D&L Supply Co. v. United States, 113 F.3d 1220, 1224 (Fed. Cir. 1997) ("[W]hen the dumping margin on which the BIA rate is based is invalidated [in another judicial proceeding] before the BIA rate has become final, it is irrational to ignore the invalidity of the underlying rate and to uphold the BIA rate as purportedly based on the 'best information available.'"); Tehnoimportexport v. United States, 15 CIT 250, 258-59, 766 F. Supp. 1169, 1178 (1991) (holding that "if the error [in ITA's calculations] was so egregious and so obvious that the failure to correct it was an abuse of discretion and undermined the interests of justice, the Court may remand the case to the ITA for adjustment of calculations").

In this regard, the Court is guided by the Federal Circuit's opinion in Borlem S.A. - Empreedimentos Industriais v. United States, 913 F.2d 933 (Fed. Cir. 1990). Borlem involved an International Trade Commission ("ITC") injury determination that was based, in part, on Commerce's finding of dumping by two Brazilian manufacturers. On remand, however, Commerce changed its position and found that the dumping margins for one of the two producers at issue was de minimis. Taking judicial notice of Commerce's new position, this Court remanded the injury determination back to the ITC to consider amending its injury determination in light of Commerce's amended antidumping determination. See Borlem S.A. - Empreedimentos Industriais v. United States, 13 CIT 535, 718 F. Supp. 41 (1989), aff'd 913 F.2d 933 (Fed. Cir. 1990). On interlocutory appeal, the Federal Circuit upheld the Court's decision, stating explicitly that "deference is not owed to a determination that is based on data that the agency generating those data indicates are incorrect . . . . [t]he law does not require, nor would it make sense to require, reliance on data which might lead to an erroneous result." Borlem, 913 F.2d at 937. The Federal Circuit found that where significant events from outside the record are properly brought to the Court's attention after the date of agency action, but before the date of decision, it was proper for the Court of International Trade to take judicial notice of such events and instruct the agency to reconsider its determination. Id. at 939. Such a result, the Court held, is effectively "no different from a reversal and remand for reconsideration because a fact relied on is unsupported by the evidence." Id. at 940.

Of course, unlike the situation in <u>Borlem</u>, in its <u>Remand Determination</u> Commerce did not actually rely on potentially erroneous data in its <u>Remand Determination</u>.  It appears not to have done so, however, only because of ambiguity in the Court's Remand Order.  As made clear by both its use of the <u>Chemical Weekly</u> (India) value in the <u>First Administrative Review</u> and its statements in the <u>Remand Determination</u>, Commerce's clear preference is to use this price in determining the Chinese manufacturers' dumping margins, and to justify doing so on the basis of comparability between octanol-1 and octanol-2.  Given that background, it would be inappropriate for the Court to wait until Commerce actually used the <u>Chemical Weekly</u> (India) value for octanol before instructing it to consider the new evidence from the <u>Third Administrative Review</u>.  Such a result would needlessly put off until a later day, and another remand, the question of whether the Court should take judicial notice of Commerce's conclusions in the <u>Third Administrative Review</u> and order Commerce to consider the letter from the editor of the <u>Chemical Weekly</u> (India) in this proceeding.  Where possible and proper, the Court can, should and prefers to avoid such a waste of administrative and judicial resources.  <u>See, e.g.</u>, <u>Timken Co. v. United States</u>, 1 F. Supp.2d 1390, 1393 (CIT 1998) (setting aside a remand order where further investigation would "unnecessarily expend limited administrative resources to conduct additional reviews"); <u>United States v. Gordon</u>, 11 CIT 192, 193 (1987) (denying a motion to vacate on the grounds that "[r]equests to vacate interlocutory opinions and orders in dismissed cases invite a waste of judicial resources"); <u>EAC Engineering v. United States</u>, 9 CIT 593, 595, 624 F. Supp. 569, 570-71 (1985) (retaining jurisdiction in a classification case on the grounds that "it would be an unnecessary waste of judicial and administrative resources to require Customs to reliquidate the merchandise, and the plaintiff to file a second protest and commence a new action in order to obtain judicial review").

**D**

**Commerce May Reopen The Administrative Record and Consider**
**New Evidence Concerning the Comparability of 2-Ethylhexanol and Octanol-2.**

Ironically, although the letter from the editor of the <u>Chemical Weekly</u> (India) appears to undermine Commerce's proffered rationale for using the <u>Chemical Weekly</u> (India) value for "octanol," this and other evidence from the <u>Third Administrative Review</u> may provide alternative grounds for using this figure as a surrogate.  Specifically, and as discussed previously, in the <u>Third Administrative Review</u> Commerce identified evidence concerning similar physical characteristics and uses between 2-ethylhexanol and octanol-2 to support its conclusion that these two products are "comparable merchandise."  <u>See</u> <u>Third Administrative Review</u>, 63 Fed. Reg. at 43,375.  On this basis, Commerce concluded that the <u>Chemical Weekly</u> value for "octanol" was an appropriate surrogate and, accordingly, used it in its by-product/co-product determination.  <u>Id.</u>

Recognizing the existence of such evidence and the conclusions that might be drawn from it, this Court is confronted with the issue of whether Commerce should be allowed, or even ordered, to consider evidence concerning the comparability of 2-ethylhexanol and octanol-2 on remand. Such a result would seem a natural corollary to the fact that this Court is already ordering Commerce to consider the letter from the editor of the Chemical Weekly (India), and it would give Commerce an opportunity to use a preferred form of evidence, publically available information from a comparable, developing economy, in its final determination. See 19 CFR 353.52(b) (1997) (establishing a hierarchy of surrogates that is to be used in determining a constructed value for the "normal price" of a product). Further, ordering Commerce to consider this evidence would not constitute a waste of governmental resources, since this case is already being remanded on other grounds, and much of the evidence that will need to be evaluated by Commerce was the subject of its Third Administrative Review. Cf. Tehnoimportexport, 15 CIT at 260, 766 F. Supp. at 1179 ("Since the case is being remanded for recalculation of packing costs, the Court finds that this additional calculation [correcting an earlier error] will not overburden the agency and will advance the interests of justice and yield a more accurate result.").

Set against these reasons for allowing Commerce to consider new evidence on the comparability of 2-ethylhexanol and octanol-2, however, are various considerations concerning the timely submission of evidence. By ordering Commerce to open the administrative record and consider the letter from the editor of the Chemical Weekly (India), the Court seeks to prevent Commerce from relying on what appears to be an erroneous factual assumption. In contrast, directing Commerce to consider new evidence concerning similar uses between 2-ethylhexanol and octanol-2 would allow it to proffer a new explanation, based on evidence outside the original record, as to why the Chemical Weekly (India) value for "octanol" is an appropriate surrogate. Neither the letter from the editor of the Chemical Weekly (India), nor evidence of overlapping uses between 2-ethylhexanol and octanol-2 were put on the record of this proceeding by Defendant-Intervenors. Accordingly, should Commerce consider such evidence, Defendant-Intervenors would stand to benefit from evidence that it did not submit during the relevant time period of the First Administrative Review.

In light of these conflicting policy considerations, the Court, under the doctrine of primary jurisdiction, finds it appropriate to let Commerce determine whether it should consider evidence concerning the comparability of 2-ethylhexanol and octanol-2 on remand. Under the primary jurisdiction doctrine, a court may refer certain matters involving agency expertise back to the agency so that it may, in the first instance, apply its specialized knowledge and experience to the question at hand. See Borlem S.A. - Empreedimentos Industriais v. United States, 13 CIT 231, 234, 701 F. Supp. 797, 800 (1989). In United States v. Western Pacific Railroad Co., 352

U.S. 59, 64 (1956), the Supreme Court set out guidelines concerning the scope of this doctrine. Although the Court stated that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," it also made clear that "[i]n every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." Id. at 64 (1956). Among the well-recognized reasons for this doctrine, the Court noted, were the desire for administrative uniformity and respect for the "expert and specialized knowledge" of agencies in their fields of competence. Id. at 64-65. As the Court noted:

> Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

Id. at 64 (quoting Far East Conference v. United States, 342 U.S. 570, 575 (1952).

In Borlem, this Court further clarified that "it would be inappropriate to invoke the doctrine of primary jurisdiction were the question before the Court entirely one of statutory interpretation." Borlem, 13 CIT at 237, 710 F. Supp. at 802. See also Great Northern Railway Co. v. Merchants Elevator Co., 259 U.S. 285, 291 (1922) ("To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function.") Rather, primary jurisdiction is appropriately invoked where the question at hand involves complicated issues of administrative policy, practice and procedure that ought best to be resolved by the agency. Borlem, 13 CIT at 237, 710 F. Supp. at 802. As the Supreme Court noted in Western Pacific:

> [T]he first question presented is whether effectuation of the statutory purposes of the Interstate Commerce Act requires that the Interstate Commerce Commission should first pass on the construction of the tariff in dispute here; this, in turn, depends on whether the question raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by the Act.

352 U.S. at 65.

Applying these principles to the question at hand, the Court finds that it is Commerce, and not this Court, which is in the best position to initially decide whether it should consider new evidence concerning the comparability of 2-ethylhexanol and octanol-2.  It is a well-established principle of administrative law that an agency is afforded broad discretion to fashion its own administrative procedure, including the authority to establish and enforce time limits concerning the submission of written information and data.  <u>Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc</u>., 435 U.S. 519, 544-45 (1978).  In accord with this authority, Commerce has promulgated regulations which set forth time limits governing the submission of factual information in antidumping investigations.  For time limits generally, 19 CFR. § 353.31(a) (1997) requires that "submissions of factual information for the Secretary's consideration shall be submitted not later than . . . seven days before the scheduled date on which the verification is to commence."  In addition, 19 CFR § 353.31(a)(2) (1997) allows any interested party to "submit factual information to rebut, clarify, or correct factual information submitted by an interested party . . . at any time prior to the deadline provided in this section for submissions of such factual information or, if later, 10 days after the date such factual information is served on the interested party . . . ."

The regulations further provide an exception to these time limits, however, for instances where the Secretary requests or solicits factual information.  19 CFR § 353.31(b) (1997) states, in part, that:

> (1) Notwithstanding paragraph (a) of this section, the Secretary may request any person to submit factual information at any time during a proceeding.

> (2) In the Secretary's written request to an interested party for a response to a questionnaire or for other factual information, the Secretary will specify the time limit for response.

In applying these regulations to the investigations before it, Commerce regularly balances its interest in conducting an efficient, uniform and expeditious administrative investigation against its equally compelling interest in conducting accurate factfinding.  Such a weighing of competing interests involves choices of administrative practice and procedure which Commerce, in its specialized role as administrator of antidumping investigations, is uniquely qualified to make.[8]  For this reason, the Court finds the question of whether to accept new evidence

---

[8] Of course, reflecting the significant deference and flexibility given to Commerce in its conduct of antidumping investigations, this Court does not review Commerce's administrative decisions <u>de novo</u>.  Rather, 19 U.S.C. § 1516a(b)(1)(B) (1994) provides that the Court "shall

concerning the comparability of 2-ethylhexanol and octanol-2 to be an issue relating to the administration of antidumping investigations which, in the interest of a uniform and expert administration of such investigations, ought to be considered by Commerce in the first instance.

Accordingly, upon remand, Commerce is instructed to consider, and express its views on, whether it should accept new evidence concerning the comparability of 2-ethylhexanol and octanol-2. Should Commerce come to the conclusion that it should accept such evidence, Commerce may do so on remand and, if appropriate, use this evidence as a basis for justifying its use of the Chemical Weekly (India) value for "octanol." In so doing, Commerce may, but need not, limit its search for information to that submitted during the Third Administrative Review. Similarly, Commerce, in its discretion, may also seek or request further information (in addition to the letter from the editor of the Chemical Weekly (India) submitted for the Third Administrative Review) concerning the true nature of the "octanol" quote from the Chemical Weekly (India).[9]

**IV**

**CONCLUSION**

For the foregoing reasons, the Court grants Defendant-Intervenors' Motion For Reconsideration. Accordingly, the Court further remands this case to Commerce with instructions that Commerce:

1.      value the octanol-2 that results from the sebacic acid production process based on an appropriate surrogate value for this product, and then recalculate the by-product/co-product determination in light of this surrogate value. This surrogate value may be an appropriate foreign or U.S. price or cost for comparable merchandise. In seeking the best available information to use as a surrogate, Commerce is to specifically consider and address all alternative surrogate values that have been placed on the record by the parties;

---

hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

[9] It should be noted that, by invoking the doctrine of primary jurisdiction, the Court is not abdicating its jurisdiction over these questions. Rather, "[u]pon completion of the remand proceedings, this Court will review all the [agency's] actions to determine if they are based upon substantial evidence and are in accordance with law." Borlem, 13 CIT at 237, 710 F. Supp. at 802.

2.      open the administrative record and consider the letter from the editor of the
        Chemical Weekly (India).  Unless Commerce is able to identify substantial record
        evidence on remand which demonstrates that, notwithstanding the letter from the
        editor of the Chemical Weekly (India), the "octanol" quote from the Chemical
        Weekly (India) is actually a quote for octanol-1, Commerce may not continue to
        argue for the use of this figure on the grounds that octanol-1 and octanol-2 are
        "comparable merchandise;" and

3.      consider, and express its views on, whether it should accept new evidence
        concerning the comparability of 2-ethylhexanol and octanol-2.  Should Commerce
        come to the conclusion that it should accept such evidence, Commerce may do so
        on remand and, if appropriate, use this evidence as a basis for justifying its use of
        the Chemical Weekly (India) value for "octanol."

In addition, the Court observes that nothing in its Remand Memorandum or Remand
Order of March 27, 1998, should be interpreted as either requiring or prohibiting the use of an
unadjusted, refined value as a surrogate for octanol-2.  Rather, if, upon remand, Commerce
continues to adhere to its position that an unadjusted, refined value is the best available
information to use as a surrogate, the Court will uphold this determination so long as its choice
of a surrogate is supported by substantial evidence on the record and is otherwise in accordance
with law.  This will be true regardless of whether the octanol-2 produced by Defendant-
Intervenors is characterized as "crude" or "refined" in nature.

As a final note, the Court wishes to express its concern with the manner in which the
Department of Commerce conducted the Remand Determination.  As discussed above, the Court
erred in its Remand Order of March 27, 1998, in stating that Commerce was to "value octanol-2
based on an appropriate cost."  While not technically incorrect, the Court's failure to say "cost or
price," or use the more generic term "value," could, if read in isolation, be interpreted as limiting
Commerce to consider only record evidence of "costs" upon remand.  To arrive at such a narrow
result, however, Commerce would have had to ignore the obvious implications of the Court's
findings in the Remand Memorandum, and it would have had to interpret the Court's Remand
Order as directly conflicting with its statutory obligations.  That is exactly what Commerce did.
See infra, Section III (B)(2).

In so interpreting the Court's Remand Order, Commerce displayed what can best be
described as a lack of common sense.  While Commerce certainly should pay great attention to
the particular language used in a court order, it is not to interpret the Court's language in a

vacuum.  Rather, if a slip opinion has been issued along with an order or judgment, Commerce should use that document in resolving any questions that may arise.  Similarly, Commerce should avoid interpreting a court order in a way that creates a conflict with the discretion conveyed to it by statute.  A proper role of courts is to clarify the scope or meaning of any order they issue, upon appropriate request.  Had Commerce here sought such a clarification before issuing its Remand Determination, much of the time and cost associated with the current litigation, as well as the further remand, could have been avoided.  All attorneys, especially those employed by the government, are obliged to their clients, the judicial system, and society in general, to maximize scarce resources and minimize waste.  This Court should not have to again remind Commerce and its attorneys of that obligation.

_____

Evan J. Wallach, Judge


Date:   April 29, 1999
           New York, New York