**Slip Op. 02-29**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  RICHARD K. EATON, JUDGE**

---

|  |  |  |
|---|---|---|
| | : | |
| **OCEAN HARVEST WHOLESALE, INC.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Court No. 00-05-00231** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| **CRAWFISH PROCESSORS ALLIANCE,** | : | |
| **THE LOUISIANA DEPARTMENT OF** | : | |
| **AGRICULTURE AND FORESTRY, AND** | : | |
| **BOB ODOM, COMMISSIONER**, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

---

Domestic Importer ("Plaintiff") brought action challenging United States Department of Commerce's ("Commerce") findings on review of antidumping duty order covering crawfish tail meat from the People's Republic of China exported by Yancheng Foreign Trade Corp. and Nantong Delu Aquatic Food Co., Ltd. ("exporters").  Plaintiff moved, pursuant to USCIT R. 56.2, for judgment upon the agency record arguing: (1) Commerce's use of facts available was improper as it had not provided exporters with adequate opportunity to respond to deficiencies in antidumping questionnaire responses; (2) Commerce impermissibly applied adverse inferences as to exporters because record did not support finding that they had not acted to the best of their abilities; and (3) Commerce relied on uncorroborated information in using adverse inferences. The United States, on behalf of Commerce, argued actions were supported by substantial evidence on the record and otherwise in accordance with law in that Commerce: (1) permissibly used facts available as exporters had adequate opportunities to remedy deficiencies in questionnaire responses; (2) properly applied adverse inferences as exporters had not acted to best of abilities inasmuch as they had not complied with Commerce's repeated requests for information; and (3) use of information for determining adverse inferences had been previously corroborated.  United States Court of International Trade, Eaton, J. held: (1) use of country-wide antidumping margin as to Yancheng Foreign Trade Corp. was not in accordance with law as

Commerce did not provide adequate opportunity to rebut nonmarket economy presumption of state control; and (2) use of country-wide margin as to Nantong Delu Aquatic Food Co., Ltd., was supported by record and in accordance with law as company had adequate notice of consequences of failing to rebut nonmarket economy presumption of state control and failed to do so.

[Antidumping determination remanded to Commerce.]

Dated:  March 20, 2002

deKieffer & Horgan (J. Kevin Horgan, Peter L Sultan), for Plaintiff.

Robert D. McCallum, Jr., Deputy Assistant Attorney General; David M. Cohen, Director, United States Department of Justice; Velta A. Melnbrencis, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch; Arthur D. Sidney, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for Defendant.

Adduci, Mastriani & Schaumberg, L.L.P., (James Taylor, Jr.); John C. Steinberger, of Counsel, for Defendant-Intervenor.

**OPINION AND ORDER**

**EATON, Judge**.  This matter is before the court on the motion of Plaintiff Ocean Harvest Wholesale Inc.[1] ("Ocean Harvest") for judgment upon the agency record pursuant to USCIT R. 56.2.  Ocean Harvest challenges aspects of the first administrative review of the antidumping duty order covering certain imports of freshwater crawfish tail meat from the People's Republic of China ("PRC") for the period of March 26, 1997, through August 31, 1998.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994) and 19 U.S.C. § 1516a(a)(2)(i)(I) (1994). Where a party challenges the findings of an antidumping administrative review, the "court shall

---

[1]      As domestic importer of the subject merchandise, Ocean Harvest is an "interested party" within the meaning of 19 U.S.C. § 1516a(f)(3) and 19 U.S.C. § 1677(9) (1994).

hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). For the reasons set forth below, the court remands this matter to Commerce with instructions to conduct further proceedings in conformity with this opinion.

## BACKGROUND

### A. Antidumping Duty Determination

On September 20, 1996, the Crawfish Processors Alliance ("Petitioner"), on behalf of the domestic industry, filed a petition with the United States Department of Commerce ("Commerce") alleging that imports of freshwater crawfish tail meat from the PRC were being sold, or were likely to be sold, in the United States at less than fair value. See Freshwater Crawfish Tail Meat From the P.R.C.; Initiation of Antidumping Investigation, 61 Fed. Reg. 54,154 (Oct. 17, 1996). Following receipt of the petition, Commerce initiated an investigation and sent antidumping questionnaires to various PRC crawfish tail meat exporters and producers. See Notice of Prelim. Determination of Sales at Less Than Fair Value: Freshwater Crawfish Tail Meat From the P.R.C., 62 Fed. Reg. 14,392, 14,393 (Mar. 26, 1997) ("Investigation Prelim. Determination"). Fully responsive questionnaires were received from numerous companies,[2]

---

[2] The following companies also timely submitted questionnaire responses: China Everbright Trading Co., Binzhou Prefecture Foodstuffs Imp. & Exp. Corp., Yancheng Fengbao Aquatic Food Co., Ltd., Huaiyin Foreign Trade Corp., Jiangsu Cereals, Oils & Foodstuffs Imp. & Exp. Corp., Jiangsu Light Indus. Prods. Imp. & Exp. (Group) Yangzhou Co., Lianyungang Yupeng, Jiangsu Overseas Group Corp., Anhui Cereals, Oils and Foodstuffs Imp. & Exp. Corp., Qidong Baolu Aquatic Prods. Co., Ltd., Shandong Foodstuffs Imp. & Exp. parte. Corp., Huaiyin Ningtai Fisheries Co., Ltd., and Yancheng Baolong Aquatic Foods Co., Ltd. See Investigation Prelim. Determination, 62 Fed. Reg. at 14,393.

including Yancheng Foreign Trade Corp. ("YFTC") and Nantong Delu Aquatic Food Co., Ltd.

("Nantong Delu") (jointly "Companies").[3] Id. Because of the number of respondents,

Commerce limited its investigation to the six largest[4] and, from the data supplied by the

respondents, identified YFTC as one of these six. Id. In addition, as it had done previously,

Commerce concluded that the PRC was a nonmarket economy country and, thus, exporters

wishing to receive a company-specific antidumping duty margin were required to demonstrate

independence from state control. Id. at 14,394. In the questionnaire responses submitted to

Commerce, all respondents indicated that they were applying for separate company-specific

margins. Id.

In August of 1997, Commerce completed its investigation and established antidumping

duty margins for individual exporters and for the PRC as a whole. Since YFTC had been

selected for review and demonstrated the requisite independence from state control, its company-

specific antidumping duty margin was set at 108.05 percent.[5] See Notice of Final Determination

of Sales at Less Than Fair Value: Freshwater Crawfish Tail Meat From the P.R.C., 62 Fed. Reg.

41,347, 41,358 (Aug. 1, 1997) ("Investigation Final Determination"). Nantong Delu, although

not one of the six exporters selected for review, was found to be fully responsive and to have

demonstrated its independence from governmental control and, thus, received a "weighted-

---

[3]     These two exporters supplied Ocean Harvest with freshwater crawfish tail meat during the period of review. (See Pl.'s Mem. Supp. Mot. J. Agency R. at 3.)

[4]     See 19 U.S.C. § 1677f-1(c)(2)(B) (1994).

[5]     See 19 U.S.C. § 1677f-1(c)(1).

average" antidumping margin of 122.92 percent.[6]  Id.  The "country-wide" PRC margin was set

at 201.63 percent.  Id.


B.        **Antidumping Duty Administrative Review**

In 1998 Petitioner sought administrative review of the antidumping order for the period of

March 26, 1997, through August 31, 1998.  This petition named YFTC and Nantong Delu as

among those exporters to be reviewed.[7]  Notice of Prelim. Results of Antidumping Duty Admin.

Review and New Shipper Reviews, Partial Rescission of the Antidumping Duty Admin. Review,

and Rescission of the New Shipper Review for Yancheng Baolong Biochem. Prods., Co. Ltd.:

Freshwater Crawfish Tail Meat From the P.R.C., 64 Fed. Reg. 55,236, 55,237 (Oct. 12, 1999)

("Prelim. Results").  On November 17, 1998, Commerce sent questionnaires[8] and instructions for

completing them to the Companies.  (Letters from Commerce to Companies of 11/17/98, Pub. R.

Doc. 8 at 3, 17.)  Among other things, Commerce solicited information regarding each

Company's management, relationship to national and local governments, and other questions

about its structure and control.

---

[6]      Commerce stated that this margin was "based on the calculated margins of the four selected respondents that fully cooperated . . . ."  Investigation Final Determination, 62 Fed. Reg. at 41,350.

[7]      See 19 C.F.R. § 351.202(b)(7)(A) (1998).

[8]      The questionnaires consisted of several sections.  Those relevant to this discussion are: A (general information); C (United States market information); and D (home market information for merchandise sold in the United States).

### 1. YFTC's Questionnaire Responses

On December 16, 1998, Commerce received YFTC's section A response. (See letter from Commerce to YFTC of 1/11/99, Pub. R. Doc. 221 at 1 (referencing receipt of section A response).) In its cover letter accompanying this section, YFTC stated that several of the included exhibits contained proprietary information. (Letter from YFTC to Commerce of 12/16/98 accompanying section A response, Conf. R. Doc. 42, Attach. 1.) None of the exhibits were marked as proprietary, however, or contained bracketed data in accordance with regulations.[9] On January 5, 1999, Commerce received YFTC's section C and D responses. (See letter from Commerce to YFTC of 2/11/99, Pub. R. Doc. 222 at 1 (referencing receipt of section C and D responses).[10]) YFTC's section C response was accompanied by a letter that stated "[t]his document contains Proprietary Information On Exibits: C1." (Letter from YFTC to Commerce of 1/5/99 accompanying section C response, Conf. R. Doc. 42., Attach. 2 at 1 (text as in original).) As with YFTC's section A response, though, this exhibit neither was marked as being proprietary nor contained bracketed data. (See YFTC section C response, Conf. R. Doc. 42, Attach. 2, Ex. C1.) YFTC's section D response was accompanied by a letter which stated that certain exhibits attached thereto contained proprietary information (letter from YFTC to Commerce of 1/5/99 accompanying section D response, Conf. R. Doc. 42., Attach. 3 at 1), however, some of these exhibits were labeled as "public" documents and none contained

---

[9] See generally Antidumping and Countervailing Duty Proceedings: Admin. Protective Order Procedures; Procedures for Imposing Sanctions for Violation of a Protective Order, 63 Fed. Reg. 24,391, 24,401–03 (May 4, 1998), effective June 3, 1998 (codified at 19 C.F.R. § 351.304) (setting forth procedure for filing proprietary information).

[10] The certified record index fixes the date of this letter's sending as February 11, 1999.

bracketed sales data.[11]  (YFTC section D response, Conf. R. Doc. 42, Attach. 3, Exs. D1, D2, D3.)  Finally, YFTC did not file the requisite number of copies of its section C and D responses with Commerce, or serve interested parties with copies of the responses in accordance with regulations.  (See letter from Commerce to YFTC of 2/11/99, Pub. R. Doc. 222.)

By letter dated January 11, 1999, Commerce informed YFTC that, while its section A response was deficient—in that it did not meet the filing and service requirements required by regulations (fax from Commerce to YFTC of 1/11/99, Pub. R. Doc. 221 at 1)—it would, nonetheless, be accepted.  (Id.)  Commerce also advised YFTC that it "remain[ed] responsible for serving this request[12] to all parties on the service list.  In addition, any future submissions not filed in full accordance with the Department's regulations [would] not be accepted."  (Id.)  The letter included a copy of the applicable regulations, a mailing address for submissions, a reminder that all submissions should be properly marked, information about the number of copies to be submitted, information as to the treatment and release of business proprietary information, and a list of interested parties required to be served with non-confidential versions of the completed submissions.  (Id. at 1–2.)  Finally, the names and phone numbers of agency contact personnel were included should YFTC have any questions.  (Id. at 2.)

---

[11]    YFTC's "section D response" was comprised of two separate responses covering two different suppliers.  The response for the first supplier, Yancheng Fubao Aquatic Food Co., Ltd., covered merchandise supplied to YFTC in 1997.  The response for the second supplier, Nantong Delu, covered merchandise supplied to YFTC in 1998.  (See YFTC questionnaire, Conf. R. Doc. 42, Attachs. 3, 4.)

[12]    Probably "response."

On January 12, 1999, YFTC replied to Commerce's January 11 letter:

> Many thanks for your kind fax dated Jan 11, 1999, which guid us how to finish our submission.
>
> First, we thank you for you had accepted out Response A, for we didn't know very clear how to finish a ggod, complete submission, so if you need more information form us, we will try our best to supply you as sson as we can. We have mailed the response for section C & D to the address what we used as Section A, we will copies of them to whom listed in your attached service list in the next a few days.

(fax from YFTC to Commerce of 1/12/99, Pub. R. Doc. 28 (text as in original).)

Notwithstanding its previous correspondence, by letter dated February 11, 1999, Commerce informed YFTC that its entire questionnaire—comprised of sections A, C, and D—was being returned. The letter stated that, in addition to the types of service and filing deficiencies described in Commerce's January 11 letter, the questionnaire responses were not in conformity with regulations concerning the submission of proprietary information. (Letter from Commerce to YFTC of 2/11/99, Pub. R. Doc. 222 at 1.) Commerce explained that, while YFTC had indicated in the letters accompanying the submissions that the responses contained proprietary information, the responses themselves were neither marked as such nor was any proprietary information identified within them. (Id.) Commerce invited YFTC to resubmit its responses and provided the applicable regulations for guidance. (Id. at 1–2.) This letter, however, contained two separate submission deadline dates. First, in paragraph four, the letter stated:

> We are returning your submissions under Section 351.304 (d) of the Department's Regulations which states that the Secretary of Commerce (Secretary) will return a submission that does not meet the requirements of this section with a written explanation. Within two business days after receiving the Secretary's explanation, the submitting person may correct the problems and resubmit the

> information. Pursuant to section 351.304 (d) (iv), if you do not take the above action, the Secretary will not consider the returned submission.[13]

(Id. at 1–2.) Then, in paragraph five, the letter stated:

> The properly marked and bracketed proprietary and public versions of all your previously tendered submissions (Sections A, C, and D responses) must be submitted and properly served according to the Department's regulations. . . . Please note that if your submissions are not submitted in the proper format and properly served by the close of business (COB) February 26, 1999, the Department may base its determination on adverse facts available in accordance with section 351.308 of the Department's regulations and Section 776 of the Tariff Act of 1930 as amended.

(Id. at 2.) Again, as with its previous letter, Commerce included the names and phone numbers of agency personnel who could assist YFTC with its submissions or questions. (Id.) Commerce received no response to this letter. (Issues and Decision Memo for the Admin. Review of the Antidumping Duty Order on Freshwater Crawfish Tail Meat from the P.R.C.—Mar. 26, 1997 through Aug. 31, 1998, Pub. R. Doc. 214 at 11 ("Decision Memo").)

Still later, by letter dated February 17, 1999, nine days before the submission deadline in paragraph five of its February 11 letter, Commerce informed YFTC that none of its submissions—including its section A response of December 16 and its section C and D responses of January 5—would be included in the administrative record for consideration in the antidumping review. (Letter from Commerce to YFTC of 2/17/99, Pub. R. Doc. 226 at 1.) In this letter Commerce stated:

---

[13]     In other words, Commerce would, pursuant to 19 U.S.C. § 1677e(a), base its determination on facts available.

> [W]e informed you that your responses to sections A, C, and D of [Commerce's] . . . questionnaire . . . did not comply with Sections 351.303 and 351.304 of the Department's Regulations governing the treatment Business Proprietary Information (BPI). For this reason, we have determined not to accept the submissions into the record of this administrative review. Enclosed are copies of your submission.
>
> A copy of the rejected submissions is being placed on the record solely for purposes of judicial review as to whether the Department properly rejected the submissions. The Department will not consider the rejected submissions in the review of crawfish tail meat from the PRC.[14]

(Id.) In apparent contradiction, however, Commerce further stated:

> Please note that if your responses are not submitted in the proper format and properly served pursuant to Sections 351.303 (b), (c), (d), (e), (f), and (g), of the Department's Regulations by the close of business February 26, 1999, the Department may base its determination on adverse facts available in accordance with section 351.308 of the Department's regulations and Section 776 of the Tariff Act of 1930 as amended.

(Id.) Commerce received no reply to this letter, and YFTC never resubmitted its questionnaire responses. (Decision Memo at 11; Pl.'s Mem. Supp. Mot. J. Agency R. at 7.)

### 2.    Nantong Delu's Questionnaire Responses

On December 25, 1998, Nantong Delu faxed its section A response to Commerce. (Letter from Commerce to Nantong Delu of 1/11/99, Pub. R. Doc. 220 at 1 (referencing receipt of section A response).) On January 11, 1999, Commerce notified Nantong Delu that its section A submission was deficient because it had not been properly filed or served on all interested

---

[14]    This language apparently meant that Commerce would not base its determination on any further information submitted but would, instead, use facts available.

parties. (Id.) Nonetheless, as with YFTC's section A response, Commerce informed Nantong Delu that its response would be accepted, but that it "remain[ed] responsible for serving this request[15] to all parties on the service list. In addition, any future submissions not filed in full accordance with the Department's regulations will not be accepted." (Id.) Commerce included a copy of the relevant regulations, the mailing address to which submissions should be sent, a reminder that all submissions should be properly marked, information about the number of copies to be submitted and the treatment and release of business proprietary information, and a list of the interested parties required to be served with non-confidential versions of the completed submissions. (Id. at 1–4.) Finally, the names and phone numbers of the appropriate contact personnel were included should Nantong Delu have any questions. (Id. at 2.)

On January 11, 1999, Nantong Delu filed responses to sections C and D. These were accompanied by a letter that stated:

> All information, including response for Section A, C, D, for the above mentioned investigation No., are finished and presented by ourselves, that's Nantong Delu Aquatic Food Co., Ltd. We didn't appoint any attorneys on this case, but the all information we have presented has been read and certified by our company official, and proved to be the best of our knowledge.
>
> We will be responsible for all information we presented, and if you have any questions on this submission, please don't hesitate to contact us.

(Letter from Nantong Delu to Commerce of 1/11/99, Conf. R. Doc. 41, Attach. 2 at 1 (text as in original).) Neither section was marked to identify it as either a public or proprietary submission.

---

[15] Probably "response."

(See generally id. at Attachs. 2, 3.)

By letter dated April 5, 1999, Commerce informed Nantong Delu it was "in receipt of your January 11 responses to sections A, C, and D of the Department of Commerce's . . . questionnaire" and its "February 2 reorganized section A response, but have not received the reorganized response for sections C and D you referred to in your February 2 letter." (Id. (referencing receipt of Nantong Delu's 2/2/99, letter).)  Further, by this letter, Commerce informed Nantong Delu that its entire submission—comprised of reorganized section A and the original sections C and D—was being returned as none of the sections conformed to regulations concerning the submission of business proprietary information.  (Id.)  Commerce also explained that it was returning Nantong Delu's reorganized section A response due to uncertainty as to the proprietary status of the document.  (Id. ("[I]n your reorganized section A response . . . you advise that the submission is a 'Public Version.' Please clarify whether this is a public document or a public version of a proprietary document.").)  Commerce further explained that it was returning Nantong Delu's section C and D responses since they had "not been marked as either public or proprietary."[16]  (Id.)  However, this deficiency letter, like the one sent to YFTC, contained ambiguous information by providing for two submission deadline dates: the first being that all submissions were to be made within two business days of receipt of the letter (id. at 1); and the second being a deadline of April 20, 1999.  (Id. at 2.)  As with the January 11, 1999, letter to Nantong Delu, this communication included the names and phone numbers of appropriate contact personnel.  (Id. at 1.)

---

[16]      See 19 C.F.R. § 351.303(d)(2)(v)–(vi).

Unlike YFTC, though, Nantong Delu replied to this communication by letter dated April

15, 1999, in which it requested an extension of time to respond to various issues raised in

Commerce's April 5, 1999, letter.  (See letter from Commerce to Nantong Delu of 4/19/99, Pub.

R. Doc. 227 at 1.[17])  Commerce granted Nantong Delu's request, and set a final filing date of

April 27, 1999.  (Id.)  This time, however, Commerce's instructions were unambiguous and to

the point:

> [I]f all of your submissions are not submitted in the proper format
> and properly served by the close of business on **April 27, 1999**, the
> Department may be required to base its determination on facts
> otherwise available and use information that is adverse to your
> interests in accordance with Section 351.308 of the Department's
> regulations and . . . 19 U.S.C. § 1677e.

(Id.)  Commerce did not receive a reply to this letter or any completed questionnaire responses.

(Decision Memo, Pub. R. Doc. 214 at 11; Pl.'s Mem. Supp. Mot. J. Agency R. at 8 (emphasis in

original).)


### C.    Administrative Review Final Results

At the conclusion of its investigation, Commerce determined that the use of facts

available and adverse inferences were warranted as to both Companies.  As to facts available

Commerce explained:

> Two firms, [YFTC] and Nantong Delu, failed to file their
> questionnaire responses in the proper manner and to serve
> responses on the other interested parties in this review, as required
> by sections 351.303 and 351.304 of the Department's regulations.
> The Department afforded [YFTC] and Nantong Delu numerous

---

[17]     Commerce sent identical copies of this letter to Nantong Delu by fax and Federal
Express.  (Letter from Commerce to Nantong Delu of 4/19/99, Pub. R. Doc. 227 at 1.)

> opportunities to remedy these deficiencies. Neither company
> complied with the applicable regulations. Consequently, the
> information was returned to [YFTC] on February 19, 1999,[18] and
> to Nantong Delu on April 5, 1999. Because [YFTC] and Nantong
> Delu failed to respond to our requests in the form and manner
> requested, we determine that they did not cooperate to the best of
> their ability with our requests for information. Therefore, pursuant
> to [19 U.S.C. § 1677e(a)(2)(B)], the use of [facts available] is
> required for [YFTC] and Nantong Delu.

Prelim. Results, 64 Fed. Reg. at 55,239; see also (Decision Memo, Pub. R. Doc. 214 at 7 ("In the

preliminary results of review, the Department applied [facts available] for both of these firms in

accordance with [19 U.S.C. § 1677e(1)(2)(B)].")); Freshwater Crawfish Tail Meat From the

P.R.C.: Final Results of Admin. Antidumping Duty and New Shipper Reviews, and Final

Rescission of New Shipper Review, 65 Fed. Reg. 20,948, 20,949 (Apr. 19, 2000) (incorporating

by reference Decision Memo reasoning) ("Final Results").  Commerce then determined the use

of adverse inferences was warranted as to the Companies:

> While [YFTC and Nantong Delu] received separate rates in the
> original investigation, it is the Department's policy that separate-
> rates questionnaire responses must be evaluated each time a
> respondent makes a separate rate claim, regardless of any separate
> rate the respondent received in the past.  However, for companies
> for which no questionnaire response is on the record, or which
> refuse verification, we are unable to evaluate whether a separate
> rate would be appropriate. In the instant administrative review,
> these companies failed to provide complete and accurate responses
> which could be used in the determination of separate rates.
> Therefore, consistent with Department practice, we are treating
> these companies, together with all other PRC companies that have
> not established that they are entitled to separate rates, as a single
> enterprise subject to government control. Thus, we have
> determined the rate applied to this single enterprise, the PRC-wide
> rate, based on adverse [facts available], in accordance with section

---

[18]       According to the record this letter was dated February 17, 1999.  (See Letter from Commerce to YFTC of 2/17/99, Pub. R. Doc. 226.)

[19 U.S.C. § 1677(b)].

Prelim. Results, 64 Fed. Reg. at 55,239 (citation omitted); see also (Decision Memo, Pub. R.

Doc. 214 at 7 ("For these final results, we continue to find that these exporters are subject to the

PRC-wide rate . . . .")); Final Results, 65 Fed. Reg. 20,949 (incorporating by reference Decision

Memo reasoning).


**DISCUSSION**

Ocean Harvest raises three arguments in support of its motion.  First, it claims that

Commerce improperly resorted to the use of facts available because neither of the Companies

was given a meaningful opportunity to remedy deficiencies in its submissions.  Second, it argues

that even if the use of facts available were warranted, the use of adverse inferences was not,

because the record does not support the Government's conclusion that the Companies did not act

to the best of their abilities.  Finally, Ocean Harvest argues that Commerce's reliance on the

underlying information used for its adverse inferences determination was not in accordance with

law since that information had not been properly corroborated.


The United States ("Government") on behalf of Commerce, asserts that Commerce

properly used facts available because both Companies failed to provide information by the

deadlines for submission, and both had adequate opportunities to remedy any deficiencies in their

submissions.  Next, the Government argues that Commerce properly used inferences adverse to

the interests of the Companies in assigning to them the PRC-wide antidumping margin of 201.63

percent because:  (1) each failed to act to the best of its ability by not complying with

Commerce's repeated requests for information; and (2) Commerce has "broad discretion in selecting an inference that is adverse to the interests of a party . . . ." (Def.'s Mem. Opp'n to Mot. J. Agency R. at 21.) Finally, the Government contends that the information underlying its adverse inference determination had been previously corroborated.

## I.       Nonmarket Economy Presumption of State Control

Where Commerce has determined that a country has a nonmarket economy,[19] all commercial entities within that country are presumed to be subject to central governmental control. Sigma Corp. v. United States, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997) ("[I]t was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control. . . . Moreover, because exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control." (citations omitted)); see also Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 25 CIT __, Slip Op. 01-120 at 50 (Sept. 28, 2001) (citing Manganese Metal from the P.R.C.; Final Results and Partial Rescission of Antidumping Duty Admin. Review, 63 Fed. Reg. 12,440, 12,441 (Mar. 13, 1998)). A nonmarket economy exporter rebuts this presumption when it can "'affirmatively demonstrate' its entitlement to a separate,

_____

[19]        A "nonmarket economy" is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(a). "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority." 19 U.S.C. § 1677(18)(c)(i). Commerce's designation of the PRC as a nonmarket economy country is not disputed.

company-specific margin by showing 'an absence of central government control, both in law and in fact, with respect to exports.'" Sigma, 117 F.3d at 1405 (quoting Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 935, 806 F. Supp. 1008, 1013–14 (1992)); Fujian Mach., 25 CIT at __, Slip Op. 01-120 at 50 (citing Final Determination of Sales at Less Than Fair Value: Sparklers From the PRC, 56 Fed. Reg. 20,588, 20,589 (May 6, 1991)). In the event that a company fails to rebut the presumption of state control and, hence, establish its entitlement to a company-specific margin, Commerce may then assign it a "country-wide" margin. See Transcom, Inc. v. United States, 182 F.3d 876, 882 (Fed. Cir. 1999) ("In the Iron Construction Castings case, Commerce applied a presumption of state government control to nonmarket economy countries and determined that if an exporter failed to demonstrate its independence from the state-controlled entity, a single, country-wide rate would be applied to the exporter's goods." (citing Iron Construction Castings From the P.R.C.; Final Results of Antidumping Duty Admin. Review, 56 Fed. Reg. 2742 (Jan. 24, 1991))); see also Sigma, 117 F.3d at 1411 (stating Commerce has a "long-standing practice of assigning to respondents who fail to cooperate with Commerce's investigation the highest margin calculated for any party in the less-than-fair-value investigation or in any administrative review." (citing D&L Supply v. United States, 113 F.3d 1220, 1222 (Fed. Cir. 1997))). Where a PRC exporter fails to (1) provide information to rebut the nonmarket economy presumption of state control, or (2) otherwise respond to Commerce's requests for information, Commerce may apply the country-wide margin to such exporter's merchandise. See, e.g., Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the P.R.C.; Final Results of 1999-2000 Admin. Review, Partial Rescission of Review, and Determination Not To Revoke Order in Part, 66 Fed. Reg. 57,420, 57,422 (Nov. 15, 2001);

Persulfates From the P.R.C.: Final Results of Antidumping Duty Admin. Review, 66 Fed. Reg. 42,628, 42,628–29 (Aug. 14, 2001); see also Union Camp Corp. v. United States, 22 CIT 267, 277, 8 F. Supp. 2d 842, 851 (1998).  However, where Commerce provides notice that is so confusing or ambiguous that it cannot be said to have provided a respondent with an adequate opportunity to rebut the nonmarket economy presumption of state control, any determination based on that respondent's failure to rebut the presumption cannot be said to be in accordance with law.  See Ta Chen Stainless Steel Pipe, Ltd. v. United States, 23 CIT 804, 819 (1999) ("The failure of Commerce to provide respondents with sufficient notice can render the decision 'unsupported by substantial evidence and otherwise contrary to law.'" (citing Usinor Sacilor v. United States, 19 CIT 711, 745, 893 F. Supp. 1112, 1141–42 (1995), rev'd on other grounds Usinor Sacilor v. United States, 215 F.3d 1350 (Fed. Cir. 1999)).

### A.    YFTC

Here, the information Commerce provided to YFTC, concerning the submission of remedial responses that might have enabled it to rebut the nonmarket economy presumption of state control, was so ambiguous as to be inadequate.  First, Commerce sent YFTC a deficiency letter stating that, although its section A response did not conform to regulations it would, nonetheless, be accepted.  Next, thirty days later, Commerce sent YFTC a second deficiency letter stating that none of its questionnaire responses—including section A—conformed to regulations and that they were being returned.  This letter then set two submission dates, the second being February 26, 1999.  Then, on February 17, 1999, Commerce sent YFTC a third letter that stated in one paragraph that none of its submissions would be included in the record

and, in a later paragraph, that its responses were due by February 26, 1999. As a result, notice was so ambiguous that it was not adequate, and the Government presents no convincing reason for Commerce's conduct. Moreover, it is evident from the record that Commerce never sought to clarify this matter for YFTC, and that the Government believes it was not required to do so. (See Def.'s Mem. Opp'n to Mot. J. Agency R. at 20–21 ("[I]f [YFTC] had questions about the actual deadlines or difficulties in correcting their submissions, all [it] had to do was contact one of the two persons identified in the letters by telephone for clarification or assistance.").) Finally, the Government's argument that YFTC should have been able to sort out the actual intended date for submission is impossible to credit. (See, id. at 20 ("If Commerce had, in fact, intended to impose a deadline of two business days, it would not have provided a different deadline in a later paragraph of the letters.").)[20] Therefore, because Commerce's letters did not provide YFTC with an adequate opportunity to rebut the nonmarket economy presumption of state control, Commerce's decision to apply the PRC-wide margin based on facts available and adverse inferences as to YFTC's merchandise is not in accordance with law. Ta Chen, 23 CIT at 819.

---

[20]     Commerce cannot expect a respondent to pick and choose among several proffered options and arrive at the correct result. See, e.g., People v. Small, 391 N.Y.S.2d 192, 194 (N.Y. App. Div. 1977) (finding court could not assume that a jury, when given both an erroneous charge and a correct one, "had the wit and ability . . . to adopt the right one and reject the wrong one." (citing People v Kelly, 99 N.E.2d 552, 554 (N.Y. 1954).) Indeed, Commerce has an obligation to provide respondents with clear notice and an adequate opportunity to correct deficiencies in their submissions, see Borden, Inc. v United States, 22 CIT 233, 262, 4 F. Supp. 2d 1221, 1245 (1998), aff'd sub nom. F.lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027 (Fed. Cir. 2000), rev'd on other grounds Micron Tech., Inc. v. United States, 243 F.3d 1301 (Fed. Cir. 2001), and here it did not.

### B.      Nantong Delu

While the Final Results are defective as to YFTC, the court is not convinced that Nantong

Delu was similarly affected by Commerce's lack of clarity.  First, the record shows that, not only

had Nantong Delu communicated with Commerce concerning the alleged deficiencies in its

submissions, but that it had begun to comply with such requests, and asked for and received an

extension of time to do so.  Second, unlike with YFTC, whatever ambiguity remained from

Commerce's earlier deficiency letters was cured, as to Nantong Delu, when Commerce granted

the requested extension of time and, in doing so, provided Nantong Delu with clear instructions

and an unambiguous final submission date.  Having provided adequate notice and receiving no

response from Nantong Delu, Commerce found:

> In the instant administrative review, [Nantong Delu] failed to
> provide complete and accurate responses which could be used in
> the determination of separate rates. Therefore, consistent with
> Department practice, we are treating [Nantong Delu], together with
> all other PRC companies that have not established that they are
> entitled to separate rates, as a single enterprise subject to
> government control.

Prelim. Results, 64 Fed. Reg. at 55,239.  Thus, because Nantong Delu did not rebut the

nonmarket economy presumption of state control, Commerce assigned the country-wide

antidumping duty margin of 201.63 percent to its merchandise.

Ocean Harvest argues, though, that Commerce's use of the country-wide margin as to

Nantong Delu's merchandise was improper because the data underlying that margin had not been

corroborated[21] as to Nantong Delu and, in addition, that the application of the country-wide

---

[21]        In the original investigation Commerce used information contained in the petition as the starting point for its calculation of the country-wide antidumping duty margin. See Investigation Final Determination, 62 Fed. Reg. at 41,349–50. Commerce, however, took steps to corroborate the information found in the petition and described its procedure:

> [W]e corroborated the margins in the petition to the extent practicable. See Corroboration Memorandum. The petitioner based export prices on actual FOB and CIF price quotations from exporters of Chinese crawfish tail meat. We compared the starting prices used by petitioner to prices derived from U.S. import statistics, and found that the similarity to the import statistics corroborated the starting prices in the petition. See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Circular Welded Non-Alloy Steel Pipe from South Africa, 61 FR 24271, 24273 (May 14, 1996); and Brake Drums and Rotors. Petitioner made deductions to the export price for foreign inland freight, using the average distance between cities where crawfish tail meat is processed in the PRC and the ports from which the majority of Chinese crawfish tail meat is exported. We could not corroborate the freight rate used by petitioner with other information on the record; therefore, we adjusted the freight rate used in the petition based on the surrogate value used in the margin calculations. We made no other adjustments to export price. Petitioner based normal value (NV) on surrogate factor values obtained from Spanish import data and publicly available information from India. We confirmed the accuracy of petitioner's NV data by comparing the values used in the petition with values obtained from publicly available information collected in these and previous NME investigations. We adjusted petitioner's NV calculation using current Spanish import statistics.

Id. at 41,349 (citing Corroboration of Data Contained in the Petition in the Antidumping Investigation of Freshwater Crawfish Tail Meat from the P.R.C., Pub. R. Doc. 234 at 2–3 (Mar. 18, 1997) ("Corroboration Mem.")); Concurrence Mem.; Final Antidumping Determination Freshwater Crawfish Tail Meat from the P.R.C., Pub. R. Doc. 235 at 6 (July 24, 1997) (citing Corroboration Mem.) ("Concurrence Mem."). In the instant review, Commerce used the same country-wide margin as in the original investigation stating that "[t]he petition rate being used in this proceeding was previously corroborated. We have no new information that would lead us to reconsider that decision." See Prelim. Results, 64 Fed. Reg. at 55,239 (citing Concurrence Mem.). Thus, this court is not faced with facts that would indicate that Commerce applied a

(continued...)

margin to Nantong Delu was not a proper use of adverse inferences. In essence, Ocean Harvest is seeking to have Commerce calculate a company-specific antidumping margin for Nantong Delu even though that company did not rebut the nonmarket economy presumption of state control. Commerce, however, is not required to take this step. Nonmarket economy companies bear the initial burden of rebutting the presumption of state control in order to receive a company-specific margin and must accept the consequences for failing to do so. Here, Nantong Delu had adequate notice of its burden of proving its independence, see Initiation of Antidumping and Countervailing Duty Admin. Review, Requests for Revocation in Part and Deferral of Admin. Review, 63 Fed. Reg. 58,009 (Oct. 29, 1998); (letter from Commerce to Nantong Delu of 4/5/99, Pub. R. Doc. 224 at 1), and, by failing to present such evidence, must accept Commerce's determination it that was part of a single PRC-wide enterprise subject to government control. Had Nantong Delu cooperated in part, it might claim the benefit of a reduced rate. Having presented no evidence that it was entitled to a company-specific rate, however, it was properly assigned the country-wide antidumping duty margin of 201.63 percent.

**CONCLUSION**

The court remands this action to Commerce so that it may conduct further proceedings in conformity with this opinion, including providing YFTC with adequate notice and a meaningful

---

[21](...continued)
margin that is either "discredited" or which does not bear a "rational relationship" to the matter to which it is applied. See World Finer Foods v. United States, 24 CIT __, __, Slip Op. 00-72 at 16 (June 26, 2000). Plaintiffs have raised no objection with respect to the corroboration of the PRC-wide margin in the original investigation.

opportunity to demonstrate its independence from state control and, thus, its entitlement to a company-specific antidumping duty margin. Such remand results are due within ninety days from the date of this opinion. Ocean Harvest shall have thirty days thereafter within which to file comments and Commerce may reply to any such comments within twenty days of their filing.

                                           _____

                                               Richard K. Eaton

Dated: March 20, 2002
       New York, New York